# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WASHINGTON, D.C.

| | |
|---|---|
| **Obed E. Bonilla-Santiago** | * |
| **Dayanara Bonilla** | * |
| **A.B., a Minor**<br>By and through her Mother and Next Friend<br>Dayanara Bonilla | * |
| **K.B., a Minor**<br>By and through her Mother and Next Friend<br>Dayanara Bonilla | * |
| *Plaintiffs*, | * |
| v. | * |
| **BLB Privatized Housing, LLC**, d/b/a, Hunt Military Communities, d/b/a Bolling Family Housing. | Case No:_____ |
| **BLB Property Managers, LLC**, d/b/a, Hunt Military Communities, d/b/a Bolling Family Housing. | (JURY TRIAL DEMANDED) |
| **Hunt Military Communities Management, LLC**, d/b/a, Hunt Military Communities, d/b/a Bolling Family Housing. | * |
| **Hunt Companies, Inc.** | * |
| **Hunt MH Shared Services, LLC**, Hunt Military Communities, d/b/a Bolling Family Housing. | * |
| *Defendants*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiffs, Obed E. Bonilla-Santiago, Dayanara Bonilla, A.B., and K.B. (collectively, the "Bonilla Family" or the "Bonillas"), for its Complaint against Defendants BLB Privatized

Housing, LLC, BLB Property Managers, LLC, Hunt Military Communities Management, LLC, Hunt Companies, Inc., and Hunt MH Property Managers, LLC, alleges as follows:

## NATURE OF ACTION

1.  This is an action for damages and other relief from the Defendants' negligent and intentional acts as they relate to housing owned, leased, subleased, operated, and maintained at Joint Base Anacostia-Bolling (hereinafter "JBAB").

2.  Plaintiffs' damages include physical and psychological injury, emotional distress inconvenience, and other expenses related to Defendants' negligent and intentional acts. Plaintiffs are also asserting a right to punitive damages.

## PARTIES AND JURISDICTION

3.  Obed E. Santiago-Bonilla (hereinafter "Sergeant Bonilla") is an individual and a resident of Florida and has been at all times relevant to this complaint been a member of the United States Marine Corps, stationed at Marine Barracks Washington, D.C. (also known as 8th & I). He currently resides at 5525-A Washington Court, SW, Washington, DC 20032.

4.  Dayanara Bonilla (hereinafter sometimes referred to as "Dayanara") is an individual and a resident of Florida, has been at all relevant times married to Obed E. Santiago-Bonilla. She currently resides at 5525-A Washington Court, SW, Washington, DC 20032.

5.  A.B. is an individual and the minor child of Obed E. Santiago-Bonilla and Dayanara Bonilla. She was born in, 2015, and she currently resides at 5525-A Washington Court, SW, Washington, DC 20032.

6.  K.B. is an individual and the minor child of Obed E. Santiago-Bonilla and Dayanara Bonilla. She was born in 2018, and she currently resides at 5525-A Washington Court, SW, Washington, DC 20032.

7. BLB Privatized Housing, LLC is a foreign limited liability company, headquartered in Texas, with its principal place of business at 4401 North Mesa, El Paso, Texas, 79902, that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., 1100 H Street, N.W., Suite 840, Washington, D.C. 20005.

8. BLB Property Managers, LLC is a foreign limited liability company, headquartered in Texas, with its principal place of business at 4401 North Mesa, El Paso, Texas, 79902, that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., 1100 H Street, N.W., Suite 840, Washington, D.C. 20005.

9. Hunt Military Communities Management, LLC is a foreign limited liability company, headquartered in Texas, with its principal place of business at 4401 North Mesa, El Paso, Texas, 79902, that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., 1100 H Street, N.W., Suite 840, Washington, D.C. 20005.

10. Hunt MH Shared Services, LLC is a foreign limited liability company, headquartered in Texas, with its principal place of business at 4401 North Mesa, El Paso, Texas, 79902, that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., 1100 H Street, N.W., Suite 840, Washington, D.C. 20005.

11. Hunt Companies, Inc. is a foreign corporation, headquartered in Texas, with its principal place of business at 4401 North Mesa, El Paso, Texas, 79902, that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., 1100 H Street, N.W., Suite 840, Washington, D.C. 20005.

12. This Court has jurisdiction under 28 U.S.C. §1332 as Defendants are companies headquartered and with their principal place of business in the State of Texas, while Plaintiffs are residents of Florida, living in Washington, D.C., and damages exceed $75,000. This Court also

has jurisdiction over this proceeding pursuant to federal enclave subject-matter jurisdiction. Federal enclave jurisdiction is part of the court's federal question jurisdiction under 28 U.S.C. § 1331.

13. Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14. On September 11, 2017, Sergeant Bonilla, his wife Dayanara, and their daughter A.B. moved to 5543-C Kisling Street, Washington, DC, (hereinafter referred to as "the residence") in the Hooe Terrace neighborhood at JBAB in Washington, D.C., so that Sergeant. Bonilla could report for his new assignment at the historic Marine Barracks Washington.

15. Hooe Terrace is a neighborhood located within the confines of JBAB, a joint U.S. Air Force and U.S. Navy installation located along the Potomac and Anacostia rivers in Southwest Washington D.C. The housing at JBAB is exclusively for members of the military stationed in and around the nation's capital, as well as military reservists and retirees.

**A. The Defendants**

16. The housing at Hooe Terrace, along with all of the housing at JBAB, was developed, owned, managed, and maintained by Defendant Hunt Companies, Inc., and its affiliates/subsidiaries Hunt Military Communities, Inc., BLB Privatized Housing, LLC, BLB Property Managers, LLC, and Hunt MH Shared Services, LLC (Collectively referred to as "Hunt" or the "Defendants"). The Defendants were selected to develop, own, maintain and manage the housing at JBAB in 2007 pursuant to the Military Housing Privatization Initiative contained in the National Defense Authorization Act for Fiscal Year 1997. The 2007 agreement between the Department of Defense and Defendants granted Defendants a 50-year land lease for the development and management of residential housing at JBAB.

17.     Hunt Companies, Inc. is a multi-national real estate development and management firm based in El Paso, Texas. Its subsidiary/affiliate, Hunt Military Communities, doing business as "Bolling Family Housing," holds itself out to be the largest owner of military housing, with over 52,000 units across the Army, Navy, Air Force, and Marine Corps. Hunt Military Communities advertises "5-Star Service," and that it provides the "highest-quality housing for our military families."

18.     At JBAB, Hunt Military Communities does business as Bolling Family Housing. BLB Privatized Housing, LLC is the entity that formally owns the housing at Bolling Air Force base and holds itself out to be the "landlord," while Hunt Military Communities (a/k/a) Bolling Family Housing manages the communities and housing. Bolling Family Housing is the trade name used by BLB Property Managers, LLC and Hunt MH Shared Services, LLC. Employees of Bolling Family Housing, however, work for Hunt Companies, Inc.

19.     Collectively, Defendants use "Hunt," "Hunt Military Communities," and "Bolling Family Housing" as the outward-facing, brand name for their rental properties. When residential tenants at JBAB receive leases, flyers, or handbooks related to their rented homes, the documents come emblazoned with the Hunt Companies logo or a variant thereof. If a tenant wants to email a member of the property management team, they can do so at the property manager's "@huntcompanies.com" email address.

**B. The Lease**

20.     On September 11, 2017, Sergeant Bonilla[1] and Dayanara signed a lease for 5543-C Kisling Street after touring the house with Marcus Pickett, the leasing agent for Hunt Military

---
[1] At the time Sergeant Bonilla signed the lease, he was a Corporal.

Communities. Dayanara noticed that the three-story townhouse had the look and smell of a house that had recently been deep-cleaned. The 13-page lease for the residential property set the price for the one-year term at $2124 per month, equal to Sergeant Bonilla's Basic Allowance for Housing, also known as BAH.[2]

21. The BAH rate is set annually by the Department of Defense, and varies based on the servicemember's rank, marital status, and duty location, and is set to approximate the cost of housing and utilities in a duty location's geographic area. For servicemembers who choose to live in the geographic area outside of a military installation, BAH is paid to them directly along with their bi-monthly pay to use as they see fit.

22. The lease with Defendants, however, authorized the Landlord to establish an "allotment" for Sergeant Bonilla's BAH with military payroll officials. In other words, the Department of Defense would pay the Defendants directly. The Bonillas agreed that if (and ultimately when) Sergeant Bonilla was promoted, they would notify the Landlord, who would in turn increase the rent and accompanying allotment to the newer, higher rate. The lease also provided that the Landlord was the only party who could terminate the allotment, leaving the Bonillas unable to withhold rent should the Landlords default on their obligations under the lease

23. In exchange for Sergeant Bonilla's BAH, that the BLB Privatized Housing, LLC (operating as Hunt, Hunt Military Communities, or Bolling Family Housing) would "make a diligent effort to repair or remedy the condition at the (p)remises." Specifically, the lease also referred and incorporated the Bolling Family Housing Resident Guidelines (hereinafter "Resident Guidelines") for information regarding community rules and maintenance requests. The Resident Guidelines in turn provided maintenance, including pest control, was the

---

[2] The $2124 per month is the rate Sergeant Bonilla was receiving as a Corporal in 2017 when he originally signed the lease.

responsibility of the Landlord, and Landlord would comply with all applicable building and house code requirements governing residential rental property in the District of Columbia.

**C. The Problems**

24. Shortly after moving in to 5543-C Kisling Street, the Bonilla family's health began to decline. Dayanara experiences migraines once or twice per week, along with episodes of dizziness that began as soon as she walks into the home. Their daughter Ani starts suffering from constant congestion.

25. The Bonillas notice a problem with rodents inside their home, their food, and on their furniture. In late October 2017, Dayanara Bonilla sees across a rat the size of a football in their kitchen pantry. They immediately notify Hunt, who sends maintenance personnel to place poison.

26. Hunt personnel did not follow up on the poison they placed, so when the poison failed to control the infestation, the Bonillas make multiple in-person trips to Hunt's on-base office to request help getting rid of the mice that they can hear behind the walls and in the ceiling.

27. The Bonillas clean constantly to remove the constantly appearing rodent feces from their home, hoping that it will keep Ani from getting sick.

28. The Bonillas request more help from Hunt, but are instead met with a combination of blame and excuses. Hunt's employees first attempt to shift the blame to the Bonillas, claiming "the rodents must have come with you when you moved in." This evolves into excuses involving JBAB's location and climate, implying that JBAB's proximity to the river made mice inevitable, or claims that the mice just wanted to come in from the cold as the weather changed.

29. Eventually, Hunt employees shift back to blaming Dayanara, claiming that rodents are in the home because she "must not clean well enough" or that her toddler "probably drops food on the floor."

30. Not content with blaming the Bonillas, Hunt employees further shift blame to the neighbors with the theory their cats and dogs were chasing rodents out of their homes and into the one occupied by the Bonillas. Hunt then proposes that the Bonillas get a cat or a dog of their own to scare the rodents away.

31. Despite the Bonillas diligent work keeping the house clean, the family notice an odd smell, which had been masked by the odor of cleaning chemicals when they first moved in. When the Bonillas tell Hunt that they believed the rodents had infiltrated the home's ventilation system, Hunt employees dismiss the idea because they claim the ductwork was impervious to rodents because it was made out of metal.

32. Ani starts having nightmares about the rodents the Bonillas hear in the walls

33. Unable to get help from Hunt, the Bonillas take measures into their own hands. They purchased their own traps, catching six mice in short order. They also purchase their own poison and chicken wire to seal up the holes deny the rodents access to their home.

34. When, Hunt finally comes to inspect the problem, they see that the Bonillas had done their best to keep the rodents under control. Hunt's employees dismiss the problem, telling the Bonillas that "it looks like you guys have it under control and don't need our help."

35. As the weather warmed up in 2018, the rodent problem seems to dissipate, but the house still has an odd smell. Visitors to the Bonillas' home complain of breathing problems inside of the house, but that those problems would resolve upon leaving. The Bonillas notice that the smell, along with their respiratory problems, seem to lessen when the windows are left open.

36. In November of 2018, the Bonillas again notice signs that the rodents had returned.

37. The following month, the Bonillas meet a previous tenant of the 5543-C Kisling Street, who tells them that they too had experienced persistent rodent infestations, and they too had reported the rodents to Hunt, who did very little, if anything, to solve the problem when they lived at 5543-C Kisling Street.

38. The conversation with the previous tenant was the final straw for the Bonillas; they needed to move from 5543-C Kisling Street. Hunt employees initially tell the Bonillas that no other houses were available for lease before offering the them family a lease on a different home managed by Defendants at JBAB.

39. In January of 2019, Hunt sends another maintenance technician to the home, where he finds two dead mice in a glue trap behind the refrigerator.

40. The same day, Obed and Dayanara acquire a snake-camera and inspect the vents, where they find trails of rodent feces inside the supposedly rodent-proof ductwork of their home.

41. In the days before the Bonilla family was set to move into a new residence, Hunt sends a cleaning crew to the residence in order to remove the rodent waste from the ductwork. The Bonillas are told that the cleaning crew does not usually conduct the cleaning while the home was occupied. Nevertheless, the cleaning crew proceeds, and used high-pressure air to remove the rodent feces from the ductwork and on to the Bonillas' belongings.

**COUNT 1 – NEGLIGENCE/PREMISES LIABILITY**

42. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

43. Defendants have a statutory duty to maintain the premises free of any condition that may render it unhealthy and unsanitary. Amongst those duties is the duty to exterminate pests such as rodents and insects. D.C.M.R. § 14-805. Therefore, Defendants had a duty to use reasonable care to provide a residence free of rodents and other pests to the Plaintiffs.

44. Defendants were aware that the residence at 5543-C Kisling Street had long-standing problems with rodents and pests prior to the Plaintiffs' taking possession of the residence.

45. Defendants breached that duty by failing to take proper measures to ensure that the residence of 5543-C Kisling Street was free of rodents and pests by failing to use proper techniques to remove pests, failing to monitor the progress of pest remediation, failing to make necessary repairs that would prevent future infestations, by failing to ensure the residence was fit for human habitation, by failing to send qualified individuals to make necessary repairs to the residence, by indicating that repairs were complete when they were not, by ignoring the Plaintiffs repeated requests for assistance in remediating the unsafe and hazardous conditions, by concealing the health hazards at the residence from the Plaintiffs, and by other means not yet known.

46. The rodents infestation occurred through no fault of the Plaintiffs.

47. As a direct and proximate cause of the Defendants' breach of the duty of care, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

### COUNT 2 – NEGLIGENT REPAIR

48. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

49. Defendants had a duty to take reasonable care to make repairs and remediations to 5543-C Kisling Street in order to prevent and eliminate pest infestations.

50. Defendants knew or should have known that residence was infested with rodents from September 11, 2017 onward, and that remediation attempts were not successful.

51. Defendants breached that duty by failing to take proper measures to ensure that the residence of 5543-C Kisling Street was free of rodents and pests by failing to use proper techniques to remove rodents, failing to monitor the progress of rodent remediation, failing to make necessary repairs that would prevent future infestations, by failing to ensure the residence was fit for human habitation, by failing to send qualified individuals to make necessary repairs to the residence, by indicating that repairs were complete when they were not, by ignoring the Plaintiffs repeated requests for assistance in remediating the unsafe and hazardous conditions, by concealing the health hazards at the residence from the Plaintiffs, and by other means not yet known.

52. The rodent infestation occurred through no fault of the Plaintiffs.

53. As a direct and proximate cause of the Defendants' breach of the duty of care, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

### COUNT 3 – BREACH OF LEASE AGREEMENT/CONTRACT

54. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if full restated herein.

55. Plaintiffs and Defendants entered into a lease agreement on September 11, 2017, wherein Defendants agreed to provide maintenance, including pest control, for the residence leased to the Plaintiffs at 5543-C Kisling Street.

56. Defendants were aware of a rodent infestation prior to the Plaintiffs taking possession of the residence.

57. Once the Plaintiffs had taken possession of the residence, they promptly notified Defendants of the rodent infestation.

58. The rodent infestation occurred through no fault of the Plaintiffs.

59. Defendants failed to take timely steps to remediate the rodent infestation, failed to monitor the progress of the remediation, failed to use proper techniques to remediate the rodent infestation, and ignored repeated requests from the Plaintiffs to address the rodent infestation.

60. The Defendants failure to provide a home free of rodents and failure to remove the rodents from the home constitutes a breach of their agreement with the Plaintiffs, as stated in the lease and documents referenced in the lease.

61. As a direct and proximate cause of the Defendants' breach of the duty of care, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

**COUNT 4 – NEGLIGENT HIRING, SUPERVISION, TRAINING AND RETENTION**

62. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs.

63. The Defendants hired, trained, and supervised individuals or entities to provide maintenance services, including pest remediation, to the house leased by the Plaintiffs. Defendants had a duty of reasonable care to hire, train, and supervise its employees and agents in the maintenance of its leased residential properties, including 5543-C Kisling Street.

64. The individuals or entities lacked the qualifications for the tasks they were hired to complete, were not properly trained in the maintenance tasks they given, and were not properly supervised by the Defendants.

65. The Defendants knew or should have known those individuals or entities were not qualified to perform the duties they were hired to perform, were not properly trained to conduct rodent/pest control/remediation, and were not properly supervised in the execution of their duties.

66. As a direct and proximate cause of the Defendants' breach of the duty of care, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

**COUNT 5 – BREACH OF COVENANT OF QUIET ENJOYMENT**

67. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

68. As residential tenants, Plaintiffs are entitled, by statute, to the quiet enjoyment of the leased property at 5543-C Kisling Street.

69. By failing to make proper efforts to remediate the rodent infestation at 5543-C Kisling Street, by purposely misstating the causes of the rodent infestation, Defendants unreasonably interfered with the tenant's comfort, safety, and enjoyment of the residence. As such, the Defendants have breached the covenant of quiet enjoyment.

70. As a direct and proximate cause of the Defendants' breach, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

**COUNT 6 – BREACH OF WARRANTY OF HABITABILITY**

71. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if full restated herein.

72. Defendants had a duty to ensure that ensure that the residence was safe and sanitary from the outset of the Plaintiffs' tenancy. D.C.M.R. § 14-805, *See also* D.C.M.R. § 14-600 *et seq*.

73. By failing to properly remediate the rodent infestation prior to and during the Plaintiffs' tenancy, the Defendants allowed an unsafe, unsanitary, and unhygienic condition to persist. These conditions presented a health hazard to the Plaintiffs along with any individual who visited the residence.

74. Therefore, the Defendants' failure to act in remediating the rodent infestation in the residence and failing to inspect for and remove the rodent feces violates the warranty of habitability, as established by the laws and regulations of Washington, D.C.

75. As a direct and proximate cause of the Defendants' breach, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

## COUNT 7 – VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROCEDURE PROTECTION ACT

76. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

77. It is a violation of the District of Columbia Consumer Procedure Protection Act to misrepresent the quality of goods and services. DC Code § 28-3904. The District's consumer protection laws apply to rental housing. *See DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 701–02 & 702 n. 8 (D.C.1999).

78. Defendants repeatedly made assurances and representations that the rental houses provided by the Defendants at JBAB and elsewhere were of high quality. Defendants also represented that they would provide maintenance and extermination services, and otherwise maintain the residence in good repair. At the very least, Defendants represented to Plaintiffs that the housing at JBAB, 5543-C Kisling Street included, was fit for human habitation.

79. When repairs were made to the residence, Defendants made assurances, both implied and explicit, that the repair and remediation services were effective, conducted in a manner consistent with industry standards, and done in a workmanlike quality. Moreover, whenever repairs and remediation services proved ineffective, Defendants and their employees blamed the Plaintiffs.

80. Plaintiffs relied on the Defendants' misrepresentations when choosing to lease housing at JBAB, specifically, 5543-C Kisling Street.

81. Defendants knew or should have known that the residence was not of high quality, habitable, or in good repair, nor would Defendants provide maintenance and extermination services throughout the Plaintiffs' tenancy.

82. As a direct and proximate cause of the Defendants' misrepresentations, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

## COUNT 8 – NEGLIGENT MISREPRESENTATION

83. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

84. Defendants repeatedly made assurances and representations that the rental houses provided by the Defendants at JBAB and elsewhere was of high quality. Defendants also

represented that they would provide maintenance and extermination services, and otherwise maintain the residence in good repair. At the very least, Defendants represented to Plaintiffs that the housing at JBAB, 5543-C Kisling Street included, was fit for human habitation.

85. When repairs were made to the residence, Defendants made assurances, both implied and explicit, that the repair and remediation services were effective, conducted in a manner consistent with industry standards, and done in a workmanlike quality. Moreover, whenever repairs and remediation services proved ineffective, Defendants and their employees blamed the Plaintiffs.

86. Defendants knew or should have known that the residence was not of high quality, habitable, or in good repair, nor would Defendants provide maintenance and extermination services throughout the Plaintiffs' tenancy.

87. Plaintiffs relied on the Defendants' misrepresentations when choosing to lease housing at JBAB, specifically, 5543-C Kisling Street.

88. As a direct and proximate cause of the Defendants' misrepresentations, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

**COUNT 9 – INTENTIONAL MISREPRESENTATION AND FRAUD**

89. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

90. Defendants repeatedly made assurances and representations that the rental houses provided by the Defendants at JBAB and elsewhere was of high quality. Defendants also represented that they would provide maintenance and extermination services, and otherwise

maintain the residence in good repair. At the very least, Defendants represented to Plaintiffs that the housing at JBAB, 5543-C Kisling Street included, was fit for human habitation.

91. When repairs were made to the residence, Defendants made assurances, both implied and explicit, that the repair and remediation services were effective, conducted in a manner consistent with industry standards, and done in a workmanlike quality. Moreover, whenever repairs and remediation services proved ineffective, Defendants and their employees blamed the Plaintiffs.

92. Defendants took active measures to conceal the true quality of the residence prior to Plaintiffs' entering into the lease for 5543-C Kisling Street, including, but not limited to masking the smell of the rodent infestation with cleaning products. Defendants knew that the residence was not of high quality, habitable, or in good repair, nor would Defendants provide maintenance and extermination services throughout the Plaintiffs' tenancy.

93. Plaintiffs relied on the Defendants' misrepresentations when choosing to lease housing at JBAB, specifically, 5543-C Kisling Street.

94. As a direct and proximate cause of the Defendants' mispresentations, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

## COUNT 10 – CONSTRUCTIVE EVICTION

95. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

96. Defendants' failures to identify, response to, or repair/remediate the rodent infestations described above resulted in serious or substantial interference with Plaintiffs' enjoyment of their leased residence.

97. Defendants intentionally failed to repair dangerous conditions that they knew existed on JBAB and of which Defendants had a duty to repair pursuant to the Ground Lease and other agreements described above.

98. Defendants' failures permanently deprived Plaintiffs of their beneficial use and enjoyment of the properties described above.

99. Plaintiffs repeatedly notified Defendants of the above defects and dangerous conditions present in their residence. Defendants made promises (when not attempting to shift blame to the Plaintiffs) to eliminate these conditions, but failed to do so.

100. Defendants' failure to repair or eliminate these dangerous conditions forced Plaintiffs to vacate the properties. Plaintiffs would not have vacated the properties but for Defendants' serious and substantial failures to maintain the properties in safe, inhabitable condition.

101. As a direct and proximate cause of the Defendants' actions and inactions resulting in the constructive eviction of the Plaintiffs, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

## COUNT 11 – VIOLATION OF THE SERVICEMEMBERS CIVIL RELIEF ACT

102. Plaintiff restates and incorporates by reference the facts and allegations in all preceding and subsequent paragraphs as if fully restated herein.

103. A primary purpose of the Servicemembers Civil Relief Act ("SCRA") is "to provide for, strengthen, and expedite the national defense through protection extended by this chapter to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. § 3902(1).

104. To that end, Section 301 of the SCRA (50 U.S.C. § 3951) prohibits a landlord from evicting an active duty servicemember or their dependents from a residence without a court order.

105. Defendants intentionally failed to repair or eliminate the dangerous conditions in the properties described above. As a direct result, Plaintiffs have vacated the properties.

106. Defendants never obtained a court order for the eviction of the Plaintiffs. Defendants' actions and inactions constitute constructive eviction by the Defendants, in violation of 50 U.S.C. § 3951(a).

107. As a direct and proximate cause of the Defendants' actions and inactions resulting in the constructive eviction of the Plaintiffs, Plaintiffs have suffered damages, including, but not limited to physical and psychological injuries, as well as loss of use and enjoyment of their home.

## PRAYER FOR RELIEF

WHEREFORE, all Plaintiffs respectfully request that this Court enter an order and judgement providing the following relief:

1. Punitive and Compensatory Damages in excess of $75,000, in an amount to be proven at trial;

2. Prejudgment and post judgment interest;

3. Plaintiffs' costs and attorney's fees; and

4. Such other and further relief as this Court deems just or proper to cure the violations specified in this Complaint, or that justice may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

    /s/ *Andrew P. Gross*  
Andrew P. Gross, Esq.  
Bar No. 187538  
**EVAN K. THALENBERG, P.A.**  
216 East Lexington Street  
Baltimore, Maryland 21202  
410-625-9100 (p)/410-625-9200 (f)  
agross@ektlaw.com