UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| OBED E. BONILLA-SANTIAGO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BLB PRIVATIZED HOUSING, LLC, <br> *d/b/a*, HUNT MILITARY COMMUNITIES, <br> *d/b/a* BOLLING FAMILY HOUSING, *et al.*, <br><br> Defendants. | Civil Action No. 20-cv-2524 (TSC) |

MEMORANDUM OPINION

Before the court in this landlord-tenant dispute is Defendants' Motion to Dismiss, ECF No. 25. For the reasons set forth below, the court will GRANT the motion in part and DENY the motion in part.

**A. BACKGROUND**

Plaintiffs Obed Bonilla-Santiago, Dayanara Bonilla, A.B., and K.B., a military family, bring this diversity action against their landlord and related entities, asserting claims for

Count 1: Negligence/Premises Liability

Count 2: Negligent Repair

Count 3: Breach of Lease Agreement/Contract

Count 4: Breach of Warranty of Habitability

Count 5: Violation of the District of Columbia Consumer Procedure Protection Act

Count 6: Negligent Misrepresentation

Count 7: Intentional Misrepresentation and Fraud

Count 8: Constructive Eviction

Page 1 of 14

Plaintiffs name the following related entities as Defendants, all of whom have the same El Paso, Texas address as their principal place of business:

- BLB Privatized Housing, LLC
- BLB Property Managers, LLC
- Hunt Military Communities Management, LLC
- Hunt MH Shared Services, LLC
- Hunt Companies, Inc.

According to Plaintiffs, Hunt Companies Inc. established all the other Defendants listed above as subsidiaries. ECF No. 23, Am. Compl. ¶ 17.

This dispute arises out of Plaintiffs' rental of a home located on Joint Base Anacostia-Bolling, in Washington, D.C., where the U.S. government selected Defendant BLB Privatized Housing, LLC to own and manage military housing. *Id.* ¶ 16. On September 11, 2017, after touring the property with BLB Privatized Housing, LLC/BLB Property Managers, LLC leasing agent Marcus Picket, Plaintiffs signed a residential lease for a three-story townhome. *Id.* ¶¶ 1, 32–33; ECF No. 28, Lease at ECF pp. 3, 13. According to Bonilla, during the tour she noticed that the townhouse had the "look and smell of a house that had recently been deep-cleaned." Am. Compl. ¶ 32.

The lease and related addenda provided that the landlord would "make a diligent effort to repair or remedy the condition at the premises," by, among other things, providing pest control and complying with the applicable building code requirements governing residential rental properties located in the District of Columbia. *Id.* ¶ 36.

Shortly after moving into the townhouse, Plaintiffs' health started to decline. *Id.* ¶ 37. For example, Bonilla experienced migraines once or twice a week and, as soon as she returned home, she experienced episodes of dizziness. *Id.* Plaintiffs subsequently "notice[d] a problem

with rodents inside their home, their food, and on their furniture," and Bonilla saw a large rat in the pantry in late October 2017. *Id.* ¶ 38. Plaintiffs notified the management office, who sent a maintenance employee to place poison in the house, but no maintenance employees followed up. *Id.* ¶¶ 38–39. Despite their efforts to keep their home clean, Plaintiffs could hear rodents behind the walls, they were constantly removing rodent feces from their home, and one of the children began experiencing nightmares about rodents. *Id.* ¶¶ 39–40, 44–45. Accordingly, Plaintiffs visited the management office several times requesting assistance. *Id.* ¶ 39.

Plaintiffs claim management responded by blaming: 1) Plaintiffs for bringing the rodents when they moved in; 2) the location of the property near the river; 3) the weather, contending the rodents were trying to come in from the cold; 4) Bonilla, for not properly cleaning the home; and 5) the neighbors, whose pets were purportedly chasing the rodents into the home. *Id.* ¶¶ 41–43.

Subsequently, Plaintiffs began noticing an "odd smell" that had been masked by the smell of cleaning products when they moved into the home. *Id.* ¶ 44. After informing management that they believed the rodents had infiltrated the house's ventilation system, Plaintiffs were told such a scenario was impossible due to the kind of ventilation system in the home. *Id.* ¶ 44.

Plaintiffs continued to hear rodents in the walls and, because they were unable to get assistance from management, purchased their own traps, poison, and chicken wire—ultimately catching six rodents. *Id.* ¶¶ 45–46. When management ultimately responded, they dismissed the problem, commenting that Plaintiffs appeared to have the matter under control. *Id.* ¶ 47.

As temperatures rose in 2018, the problem seemed to dissipate, but the house still smelled "odd," and visitors complained of breathing problems while inside. *Id.* ¶ 48. Plaintiffs noticed that their symptoms and the smell lessened when the windows were open. *Id.*

By November 2018, the rodents had returned, and Plaintiffs met a previous tenant who reported experiencing persistent rodent infestations while residing in the townhouse. *Id.* ¶¶ 49–

50. The former tenant explained he had reported the problem, but management had done little, if anything, about the matter. *Id*. ¶ 50. Consequently, Plaintiffs informed management they wanted to move, but were told there were no units available. *Id*. ¶ 51.

In January 2019, management sent another maintenance technician, who found two dead mice in a glue trap behind the refrigerator. *Id*. ¶ 52. That same day, Plaintiffs secured a snake camera and discovered trails of rodent feces inside their ventilation system. *Id*. ¶ 53. Management later offered Plaintiffs a lease in a different unit, and a few days before they were scheduled to move, management sent a cleaning crew to remove the feces from the ventilation system. *Id*. ¶¶ 51, 54. Plaintiffs claim the cleaning crew told them that they typically do not perform such a task before tenants vacate, and during the cleaning rodent feces fell on Plaintiffs' belongings. *Id*. ¶ 54. Despite the fact that they were relocated, Plaintiffs allege they were harmed by the loss and enjoyment of their original home. *Id*. ¶ 101.

Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 8(a), 9, and 12(b)(6).

**B.   STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). If the facts as alleged, which must be taken as true, fail to establish that a plaintiff has stated a claim upon which relief can be granted, the Rule 12(b)(6) motion must be granted. *See, e.g.*, *Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

Fed. R. Civ. P. 8(a) requires that a complaint contain "(1) a short and plain statement of the grounds for the court's jurisdiction [and] (2) a short and plain statement of the claim showing that the pleader is entitled to relief." This minimum standard ensures that defendants receive fair

notice of the claim being asserted so they may prepare a responsive answer, prepare an adequate defense, and assess whether the doctrine of *res judicata* applies. *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977).

## C.  ANALYSIS

### 1.  Federal Rule of Civil Procedure 8(a)

Defendants first argue that the Amended Complaint does not give them fair notice of the claims against them. They contend that the Amended Complaint is inadequate because Plaintiffs assert each claim against the Defendants collectively, rather than identifying each Defendant's specific role and actions. Defendants note that some courts have rejected this type of "group pleading," citing *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016), and *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001). They also argue that the Amended Complaint contains confusing allegations about the relationship between the various Defendants, as well as legal conclusions about their connectedness.

While some of Plaintiffs' allegations are confusing, they have pled a plausible connection between all but one of the named Defendants based on the following alleged facts:

- Although Plaintiff signed a lease with landlord BLB Privatized Housing, LLC and property manager BLB Property Managers, LLC, the top of the lease's first page contains a stylized rendering of a house as an insignia, followed by "Bolling Family Housing, A Hunt Military Community." ECF No. 28, Lease at ECF p. 2. The "Dispute Resolution Policy" and "The Satellite Dish Installation Agreement" contain the same insignia and wording. Lease at ECF pp. 29, 33.

- The word "Hunt" appears as the insignia at the top of the "Official Hunt Resident Orientation Checklist," the "Replacement Charges" notice, as well as the "Itemized Move-Out Condition Charges Addendum." Lease at ECF pp. 30, 32, 34

- Residents email the property manager at a @huntcompanies.com email address. Am. Compl. ¶ 26.

Viewing the facts in the light most favorable to Plaintiffs, there is some interconnectedness between alleged parent company Hunt Companies, Incorporated, and BLB

Property managers, LLC, as well as Hunt Military Communities Management d/b/a Hunt Military Communities. Moreover, Defendants communicated this interconnectedness to the residents via the lease documents, as well as the email address for residents to contact management, thereby making it difficult for Plaintiffs to discern which company was responsible for specific instances of alleged harm. At the motion to dismiss stage, Plaintiffs cannot be penalized for confusion caused by Defendants' own conduct, which distinguishes this case from those Defendants cite. Accordingly, under the facts alleged here, "grouping" these Defendants is not fatal to Plaintiffs' claims.

Notwithstanding this interconnectedness between most of the Defendants, the court is unable to identify any factual allegations or lease documents connecting Defendant Hunt MH Shared Services, LLC to Plaintiffs or their claims, and the fact that this company is allegedly a subsidiary of Hunt Companies, Inc. is not, without more, a sufficient nexus. Accordingly, the court will dismiss Hunt MH Shared Services, LLC without prejudice. Should Plaintiffs find evidence of a relevant connection between Hunt MH Shared Services, LLC and the challenged conduct, they may move to amend the complaint.

    **2.**    **Count 6 (Negligent Misrepresentation) and Count 7 (Intentional Misrepresentation and Fraud)**

In Count 6, Plaintiffs allege negligent misrepresentation, claiming that Defendants represented they would provide maintenance and extermination services, as well as maintain the residence in good repair, and that any repairs would be performed consistent with industry standards. Am. Compl. ¶¶ 97–98. In Count 7, Plaintiffs claim Defendants intentionally misrepresented on its website that their housing was the "highest quality," and intentionally failed to inform Plaintiffs that the townhouse was unfit for human habitation. *Id*. ¶¶ 103, 106. According to Plaintiffs, Defendants actively attempted to conceal the townhouse's condition by masking the smell of rodent feces with cleaning products. *Id*. ¶ 110.

a.     Particularity

Defendants contend that Counts 6 and 7 are not pled with the "particularity required by the Federal Rules," specifically that Plaintiffs do not state who made misrepresentations, when they were made, or the place and content of the false representations.  ECF No. 25, Mot. to Dismiss at 11.

This argument is also unpersuasive.  The facts alleged suggest that the interconnectedness between all but one of the Defendant companies may have made it difficult for Plaintiffs to know the identity of the company with whom they were communicating at any given moment.  Likewise, it is not uncommon that a tenant will fail to record the name of every maintenance or property management employee with whom they interact, especially when dealing with large corporate landlords.

With respect to the timing of the allegedly fraudulent representations, Plaintiffs have identified specific months and time periods during which they communicated with Defendants.  This information is enough to put Defendants on notice as to when the alleged misrepresentations were made.  Plaintiffs need not provide in the Complaint a specific date for every time they communicated with management over a period of more than a year.  Likewise, Defendants are on notice as to where the alleged misrepresentations occurred—at Plaintiffs' residence and at the management office.  Finally, Plaintiffs have sufficiently identified the content of the alleged misrepresentations, including masking the smell of rodent feces, claiming ventilation infestation was impossible, and blaming the problem on Plaintiffs and external forces not within the Defendants' control.

b.     Misrepresentation and Negligence Claims Not Actionable as Tort Claims
       Separate from Plaintiffs' Breach of Contract Claim

Citing *Chohoris v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008), Defendants next argue that Plaintiffs' intentional and negligent misrepresentation/fraud claims

fail because any duty owed to Plaintiffs arose from the lease and therefore cannot form the basis of a separate tort claim. In *Chohoris*, the D.C. Court of Appeals explained that "any duty upon which the tort is based must flow from considerations other than the contractual relationship." 961 A.2d at 1089. "[A] a cause of action that could be considered a tort independent of contract performance is a viable claim" so long as the injury to the plaintiff constitutes "an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit." *Id*. In other words,

> the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship. The tort must stand as a tort even if the contractual relationship did not exist. Thus, conduct occurring during the course of a contract dispute may be the subject of a fraudulent or negligent misrepresentation claim when there are facts separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort.

*Id.* (citations omitted).

Without reference to any legal authority, Plaintiffs make two arguments. First, they argue that their claims are cognizable because they suffered physical and psychological injuries due to Defendants' alleged negligence. ECF No. 29, Pls. Resp. at 5–6. Therefore, their injuries extended beyond the "disappointment of plaintiff's hope to receive the contracted-for benefit." *See Chohoris*, 961 A.2d at 1089.

This argument is unavailing. The basis of Plaintiffs' Complaint is that they contracted for a residence free of rodents. They claim that because they did not receive that benefit—*i.e.*, the Defendants breached the contract—they suffered injuries. The fact that the alleged injuries were physical and psychological is irrelevant because the basis of the alleged tortious injury must be "separable from the terms of the contract" and any

"action for breach of contract [must] reach none of the damages suffered by the tort." *See id*. Plaintiffs' injuries stem from alleged violations of the terms of their lease.

In *Chohoris,* the D.C. Court of Appeals noted that a plaintiff involved in an insurance contract dispute could bring a separate tort claim where the insurance company slandered her. 961 A.2d at 1088. This is because the duty and the harm sounding in a slander claim were unconnected with the duties and harm flowing from the contract breach. *Id.* at 1089. In contrast, Plaintiffs here state "no legal duty, aside from a contractual duty, for Defendant[s] to" provide the benefit of the bargain and make Plaintiffs whole for injuries caused by a contract breach. *See Jones v. NVR Incorporation*, No. CV 20-453 (CKK), 2020 WL 2064085, at *5 (D.D.C. Apr. 29, 2020) (granting defendant homebuilder's motion to dismiss fraud claim as duplicative of plaintiff's breach of contract claim, where plaintiff alleged that defendants committed fraud by defectively installing plumbing and concealing the defects).

Plaintiffs next argue that their claims stem from an independent, extra-contractual duty arising from D.C. Municipal Regulations requiring landlords to provide extermination services before renting a structure, and maintain "rat-proofed" premises free of any conditions that might make the premises unhealthy or unsanitary for the occupant, neighborhood, or community. Pls. Resp. at 6 (citing 12 D.C.M.R. § PM-309G; 14 D.C.M.R. §§ 800, 804, 805.4).

As Defendants correctly point out, Plaintiffs did not claim a breach of statutory duties in their Complaint, and they cannot amend by way of opposition brief. And even if these regulations generally provide a basis for asserting a tort claim, Plaintiffs have not pointed to any legal authority suggesting that the regulations allow them to side-step the rule set forth in *Chohoris*. Accordingly, the court will grant Defendants' motion and dismiss

Plaintiffs' Negligent Misrepresentation (Count 6) and Intentional Misrepresentation and Fraud claims (Count 7) without prejudice.

### 3. Negligent Repair (Count 2)

Plaintiffs' Negligent Repair claim (Count 2) fails for the same reason as does their misrepresentation claims addressed above.

### 4. Consumer Protection and Procedures Act (Count 5)

Defendants argue that Plaintiffs' D.C. Consumer Protection and Procedures Act claims are not actionable because the cited provisions do not apply to landlord-tenant relationships. *See Gomez v. Indep. Mgmt. of Del., Inc.*, 967 A.2d 1276, 1287–88 (D.C. 2009) (rejecting application of the CPPA to landlord-tenant relations). Having considered Defendants' cited authority and Plaintiffs' failure to contest this argument, pursuant to Local Civil Rule 7(b), the court will treat the issue as conceded and grant Defendants' motion on Count 5.

### 5. Constructive Eviction (Count 8)

Defendants argue that Plaintiffs' constructive eviction claim (Count 8) fails because Defendants relocated Plaintiffs to another residence and therefore committed no act of a permanent nature depriving Plaintiffs of possession. In *International Commission on English in the Liturgy v. Schwartz*, 573 A.2d 1303, 1305 (D.C. 1990) (citation omitted), the D.C. Court of Appeals explained that "[t]o constitute constructive eviction, 'the landlord must have done, or be responsible for, some act of a permanent character with the intention and effect of depriving the tenant of the enjoyment of the demised premises or a part thereof.'"

Plaintiffs argue that the fact that Defendants moved them to another residence is irrelevant because they were forced to abandon the property for which they contracted. Noting that the District of Columbia courts have not interpreted what constitutes "permanence" for purposes of establishing a constructive eviction claim, Plaintiffs rely on cases such as *Robinson*

*v. Diamond Hous. Corp.*, 463 F.2d 853, 869 (D.C. Cir. 1972) (citations omitted), in which the D.C. Circuit stated "[i]n situations where the landlord is able but unwilling to repair the premises, he has, by hypothesis, made them uninhabitable and hence constructively deprived the tenant of possession."

The court finds Plaintiffs' argument unavailing for several reasons. First, none of Plaintiffs' cited cases involved a tenant whose landlord relocated them to another residence.

Second, allowing a constructive eviction claim here would be inconsistent with the policy behind that cause of action: to give tenants living in uninhabitable properties the option to leave without the obligation to continue paying rent or to provide them with the option to remedy the defect and deduct the cost of repairs from the rent. As courts in this jurisdiction have explained, "constructive eviction assures a tenant of a premises fit for possession, which is precisely what the warranty of habitability assures. In fact, the two doctrines are often viewed as alternative remedies for the same harm: Under constructive eviction, the tenant could leave without any continuing obligation to pay rent; under the warranty of habitability, the tenant could repair and deduct." *Beltway Mgmt. Co. v. Lexington-Landmark Ins. Co.*, 746 F. Supp. 1145, 1155 (D.D.C. 1990) (citations omitted). Here, once Plaintiffs relocated, they had no ongoing obligation to pay rent for a residence they could not inhabit. *See Robinson*, 463 F.2d at 870 ("The tenant's voluntary relinquishment of possession ends the case or controversy when, as here, the landlord makes no claim for back rent.").

Plaintiffs asked to be relocated and therefore elected a remedy other than treating the tenancy as a constructive eviction: they did not elect to end their rental relationship with Defendants, move to property not owned by the Defendants and then sue for constructive eviction. While the court is sympathetic to the challenges moving to a different property might have posed for this military family, the court is not convinced that deciding to avoid those

challenges gives rise to liability for constructive eviction. Finally, to the extent Plaintiffs wish to pursue any damages associated with the relocation, it is unclear why they cannot do so through their breach of contract claim.

### 6. Negligence/Premises Liability (Count 1), Breach of Lease Agreement/Contract (Count 3), and Breach of Warranty of Habitability (Count 4)

Defendants argue that Plaintiffs' remaining claims for Negligence/Premises Liability, Breach of Lease Agreement/Contract and Breach of Warranty of Habitability are not actionable against the non-landlord Defendants: BLB Property Managers, Hunt Military Communities Management, and Hunt Companies. Defendants also argue that Plaintiffs have not pled sufficient facts to suggest liability by piercing the corporate veil; *i.e.*, Plaintiffs cannot pierce the veil solely based on corporate affiliations, similar emails, and trade names.

Defendants' arguments are unpersuasive. Plaintiffs do not simply rely on affiliations and emails. Rather, the email address and lease documents suggest a plausible level of involvement and/or control by the various Defendants, such that they could be considered landlords or that the corporate veil may be pierced. And the Defendants have provided no authority that would suggest otherwise. *See* ECF No. 30, Defs. Reply at 3–5 (citing *Lawlor v. D.C.*, 758 A.2d 964, 968 (D.C. 2000) (involving resolution of a corporate veil theory during a bench trial); *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 90 (D.D.C. 2004) (involving personal jurisdiction over a subsidiary); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (granting motion to dismiss where plaintiff asserted claims based on the mere "proximity" of the defendants, as well as asserted facts regarding certain defendants that were "sparse to the point of non-existence," and "grouped [certain defendants] together with specific allegations relating to their affiliated but legally separate entities."); *Amore ex rel. Ests. of Amore v. Accor*, 529 F. Supp. 2d 85, 93–94 (D.D.C. 2008) (denying motion to amend the complaint to add

corporate defendant where plaintiff failed to "articulate [the new defendants'] involvement in the underlying facts giving rise to this suit" and claimed the new defendants' level of involvement was "irrelevant"); *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 8–9 (D.D.C. 2003) (finding lack of personal jurisdiction and denying request for discovery where plaintiff simply pled that two companies shared the same executives and engaged in joint promotion)).

Moreover, Defendants incorrectly assert that "[c]ourts will not pierce the corporate veil unless a party can show the corporate form was used to perpetuate [sic] a fraud." Defs. Reply at 4. District of Columbia law no longer requires "a showing that an entity used the corporate form to perpetrate fraud or wrong . . . . Properly enunciated, the D.C. veil-piercing doctrine requires (1) unity of ownership and interest between the entities, and (2) either use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 66–67 (D.D.C. 2011) (cleaned up) (citing *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984); *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008)) (cleaned up and some citations omitted). Here, Plaintiffs have alleged facts sufficient to support a plausible inference that the remaining Defendants who were not signatories to the lease were alter egos of the "landlord" BLB Privatized Housing, LLC.

Moreover, these facts suggest a plausible level of involvement and/or control by the various Defendants to satisfy the definition of an owner under the District of Columbia Municipal Regulations, which provide that an owner "[h]as charge, care, or control of any building, arranged, designed or used (in whole or in part) to house one or more habitations, as owner or agent of the owner . . . ." 14 D.M.C.R. § 199. Accordingly, the court will deny Defendants' motion to dismiss Plaintiffs' Negligence/Premises Liability (Count 1), Breach of Lease Agreement/Contract (Count 3), and Breach of Warranty of Habitability (Count 4) claims.

## D.  CONCLUSION

For the reasons set forth above, the court will GRANT Defendants' motion in part and deny in part.  The court will DISMISS, without prejudice, Count 2 (Negligent Repair), Count 6 (Negligent Misrepresentation), Count 7 (Intentional Misrepresentation and Fraud), Count 8 (Constructive Eviction), and Defendant Hunt HM Shared Services, LCC.

The court will DISMISS with prejudice Count 5 (Violation of the District of Columbia Consumer Procedure Protection Act).

In all other respects the motion will be DENIED.

Date:  March 31, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge