**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BONILLA-SANTIAGO, et al., | ) CASE NO. 1:20-cv-02524-TSC |
| Plaintiffs, | ) |
| v. | ) |
| BLB PRIVATIZED HOUSING, LLC, et al., | ) |
| Defendants. | ) |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SAME**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................... 1

FACTS AND PROCEDURAL HISTORY ........................................................................... 3

    A.  The Defendants ...................................................................................................... 3

    B.  Pest Control Practices and Procedures at BLB Privatized Housing, LLC ......................... 3

    C.  Plaintiffs' Tenancy ................................................................................................. 4

    D.  Plaintiffs' Release of Claims .................................................................................. 6

    E.  Plaintiffs' Alleged Damages and Mental Distress .................................................. 6

    F.  Procedural History ................................................................................................. 9

ARGUMENT ....................................................................................................................... 11

I.    THE RELEASE BARS THE PLAINTIFFS' CLAIMS AS A MATTER OF LAW .............. 11

    A.  The Release Bars All Three Remaining Counts .................................................... 12

        1.  Negligence/Premises Liability ................................................................. 12

        2.  Breach of Lease ........................................................................................ 13

        3.  Breach of Warranty of Habitability ......................................................... 13

II.    INDEPENDENT OF THE RELEASE, PLAINTIFFS' CLAIMS FAIL AS A
MATTER OF LAW ....................................................................................................... 14

    A.  Negligence/Premises Liability .............................................................................. 14

        1.  The Negligence Claim Is Duplicative of the Breach of Lease Claim. ........... 14

        2.  Plaintiffs Cannot Satisfy the Essential Elements of their Negligence Claim. ........... 15

        3.  Plaintiffs' Damages Are Unrecoverable ................................................. 16

    B.  Breach of Lease .................................................................................................... 20

    C.  Breach of the Warranty of Habitability ............................................................... 22

III.  PLAINTIFFS CANNOT PIERCE THE CORPORATE VEIL TO REACH THE
AFFILIATE DEFENDANTS. ....................................................................................... 24

CONCLUSION .................................................................................................................... 27

i

**<u>TABLE OF AUTHORITIES</u>**

**<u>Page(s)</u>**

<u>Cases</u>

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
   346 F. Supp. 2d 64 (D.D.C. 2004) ......................................................................................25

*Alkanani v. Aegis Defense Servs., LLC*,
   976 F. Supp. 2d 1 (D.D.C. 2013) ...................................................................................26, 27

*Anderson v. D.C. Hous. Auth.*,
   923 A.2d 853 (D.C. 2007) .................................................................................................22

*Armstrong v. Navient Solutions, LLC*,
   292 F. Supp. 3d 464 (D.D.C. 2018) ...................................................................................21

*Asuncion v. Columbia Hosp. for Women*,
   514 A.2d 1187 (D.C. 1986) ...............................................................................................21

*Bernstein v. Fernandez*,
   649 A.2d 1064 (D.C. 1991) ...............................................................................................22

*Bolling Federal Credit Union v. Cumis Ins. Soc'y, Inc.*,
   475 A.2d 382 (D.C. 1984) .................................................................................................11

*Bond v. U.S. Dep't of Justice*,
   828 F.Supp. 2d 60 (D.D.C. 2011) ......................................................................................21

*C.I. Energia Solar, S.A. v. Ranger Specialized Glass*,
   2019 WL 1330852 (D.D.C. Mar. 25, 2019)........................................................................26

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................................11

*Choharis v. State Farm Fire & Cas. Co.*,
   961 A.2d 1080 (D.C. 2008) .........................................................................................10, 14

*Cobb v. Washington Metro. Area Transit Auth.*,
   2021 WL 2935891 (D.D.C. July 13, 2021).........................................................................18

*El v. Oparaugo*,
   2022 WL 2104484 (D.D.C. 2022) ................................................................................18, 19

*Freyberg v. DCO 2400 14th St., LLC*,
   2021 WL 1317545 (D.D.C. Apr. 8, 2021) ....................................................................13, 22

*Glycobiosciences, Inc. v. Vichy Laboratories, S.A.*,
    2023 WL 157322 (D.D.C. Jan. 11, 2023) ................................................................26

*Hedgepeth v. Whitman Walker Clinic*,
    22 A.3d 789 (D.C. 2011) ........................................................................................17

*Javins v. First Nat'l Realty Corp.*,
    428 F.2d 1071 (D.C. Cir. 1970) ........................................................................13, 22

*Jefferson v. Collins*,
    210 F. Supp. 3d 75 (D.D.C. 2016) ...............................................................11, 24, 27

*Kelleher v. Dream Catcher, LLC*,
    221 F. Supp. 3d 157 (D.D.C. 2016) ........................................................................26

*Parham v. CIH Properties, Inc.*,
    208 F. Supp. 3d 116 (D.D.C. 2016) ........................................................................22

*Poola v. Howard Univ.*,
    147 A.3d 267 (D.C. 2016) ......................................................................................15

*Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*,
    868 F. Supp. 346 (D.D.C. 1994) .............................................................................10

*Rice v. Dist. of Columbia*,
    774 F. Supp. 2d 25 (D.D.C. 2011) ..........................................................................18

*Sibley v. St. Albans School*,
    134 A.3d 789 (D.C. 2016) ......................................................................................17

*Steele Foundations, Inc. v. Clark Constr. Grp., Inc.*,
    937 A.2d 148 (D.C. 2007) ......................................................................................13

*TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*,
    808 F. Supp. 2d 60 (D.D.C. 2011) ..........................................................................24

*Trustees of Univ. of D.C. v. Vossoughi*,
    963 A.2d 1162 (D.C. 2009) ....................................................................................20

*Tsintolas Realty Co. v. Mendez*,
    984 A.2d 181 (D.C. 2009) ......................................................................................21

*Uni-Top Asia Investment Ltd. v. Sinopec Int'l Petroleum Exploration & Production Corp.*,
    2022 WL 252029 (D.D.C. Jan. 26, 2022) ................................................................24

*D.C. v. Washington Hosp. Ctr.*,
    722 A.2d 332 (D.C. 1998) ......................................................................................11

*Williams v. Baker*,
    572 A.2d 1062 (D.C. 1990) ........................................................................17, 20

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    24 F.4th 686 (D.C. Cir. 2022) ...........................................................................14

<u>Statutes and Codes</u>

D.C. Code
    Section 42-507 ...................................................................................................13
    Section 42-518 ...................................................................................................13

D.C. Municipal Regulations
    Section 14-600 ...................................................................................................23
    Section 14-601 ...................................................................................................23
    Section 14-603 ...................................................................................................23
    Section 14-605 ...................................................................................................23
    Section 14-805 ............................................................................................12, 22
    Section 14-805.1 ................................................................................................23
    Section 14-805.3 ................................................................................................23
    Section 14-805.5 .....................................................................................15, 22, 23

Federal Rules of Civil Procedure
    Rule 56(c)..........................................................................................................10

## **INTRODUCTION**

This case arises from a lease entered into between Plaintiff Obed Bonilla-Santiago ("Sgt. Bonilla-Santiago") and Defendant BLB Privatized Housing, LLC (the "Landlord") for family military housing (the "Residence") at Joint Base Anacostia-Bolling in Washington, D.C. ("JBAB"). Under the Lease, Sgt. Bonilla-Santiago and his family (the "Tenants" or "Plaintiffs") were responsible for $2,124 per month in rent, an amount equal to their Basic Allowance for Housing paid by the Air Force.

Sgt. Bonilla-Santiago executed the lease on September 11, 2017 and the Tenants moved into the Residence the same day. About two months later, in November 2017, the Tenants complained of rodents in the Residence. In response, the Landlord undertook extermination measures using a commercial pest control service who successfully eradicated the rodents by no later than December 25, 2017. The Tenants had no further issues with rodents until approximately one year later, when they said the rodents had returned and asked to move into another house. The Landlord renewed its pest control efforts, and granted the Tenants' request for a different home, which they moved into on February 1, 2019. Shortly thereafter, to settle a demand by the Tenants, the Landlord paid the Tenants $10,553 in exchange for a written release of claims arising from their tenancy (the "Release"), excepting only claims for "personal injury," which the Release carved out. The Plaintiffs then filed this action on September 9, 2020.

After full discovery, Plaintiffs admit they have never been diagnosed with any medical conditions attributable to their residency and are not seeking medical expenses or any manner of damages for physical injury – it is now undisputed that Plaintiffs suffered no physical injuries from the brief period of time mice were in the home. Instead, the Plaintiffs' sole remaining grievance is that they experienced temporary stress and anxiety as a result of having rodents in their home –

1

stress and anxiety that Plaintiffs testified abated after the Landlord eradicated the pests.  Plaintiffs seek **$2,000,000** in damages for alleged "mental anguish and distress" – $500,000 for each member of the family including Minor Child K.B., who was four years old when she left the Residence, and Minor Child A.B., who was in utero for most of the tenancy.   Plaintiffs have produced no expert testimony or any other competent evidence to support such a claim.  To the contrary, the $2,000,000 number was spun from whole cloth by Plaintiffs' counsel, without any apparent basis. Aside from these entirely speculative "mental anguish" damages, the Plaintiffs also seek $40,000 for all of the rent (i.e., BAH) paid to the Landlord during their tenancy (including months where there were no rodents at all).  These claims – $2,000,000 for "mental anguish" and $40,000 for rent – are the <u>only</u> damages at issue.

This is a paradigmatic case for dismissal at the summary judgment stage.  The undisputed facts show that the Tenants complained of rodents in their house; the Landlord responded and successfully eliminated the rodent problem within two months of that complaint; the Tenants claimed that rodents reoccurred one year later; and the Landlord then granted the Tenants' request to move to a different home.  The Plaintiffs did not suffer any physical injury or serious mental health issues attributable to the rodents.  What is more, the Plaintiffs have already received a settlement payment of $10,533 from the Landlord in exchange for a release of all property-related claims, which clearly bars Plaintiffs claim for $40,000 in rent.  The evidence offered by Plaintiffs cannot support a finding of liability, let alone an award of any damages, and no reasonable jury could return a verdict against the Defendants in this case.  The Court should grant summary judgment and dismiss all Plaintiffs' claims with prejudice.

## FACTS AND PROCEDURAL HISTORY

### A.    The Defendants

The Landlord – Defendant BLB Privatized Housing, LLC – is a private company that owns 815 military family housing units and related community amenities at JBAB.  Defendants' Statement of Undisputed Material Facts ("SOF") ¶ 2.  The homes are leased to military servicemembers and their dependents who are stationed at JBAB and other D.C.-area military installations.  SOF ¶ 3.  Defendant BLB Property Managers, LLC (the "Property Manager") is a property management company that the Landlord contracts with for the performance of certain property management services at JBAB, including engaging pest control services as needed.  SOF ¶ 8.  The other two Defendants – Hunt Companies, Inc. and Hunt Military Communities, LLC (collectively with the Property Manager, the "Affiliate Defendants") are corporate affiliates of the Landlord and Property Manager, but have no other connection to the claims raised in this lawsuit. SOF ¶¶ 15-16, 64, 73.

### B.    Pest Control Practices and Procedures at BLB Privatized Housing, LLC

The Landlord is required to follow the standards set forth in the Integrated Pest Management Plan ("IPMP") that governs pest control activities at JBAB.  SOF ¶ 4.  Under its agreement with the Air Force, the Landlord is also required to follow a Facilities Maintenance Plan that outlines the pest control standards.  SOF ¶ 5.  In addition to following the pest control standards set forth in those documents (and requiring its external vendors to do the same), the Landlord, through its Property Manager, also implements its own pest control standards.  SOF ¶¶ 6-9.  The Property Manager engages contractors on the Landlord's behalf to perform pest control services at JBAB on a weekly or twice-weekly basis and also performs quarterly maintenance in all homes.  SOF ¶¶ 10-11.

The Property Manager, acting for the Landlord, also has an established maintenance program to handle maintenance concerns, including pest control-related complaints. SOF ¶ 12. When the Property Manager receives a maintenance request regarding pest control, the manager generates a work order that is entered into the Landlord's computer system, evaluated for priority, and then responded to by maintenance technicians and/or third-party pest control contractors during periodic home visits. SOF ¶¶ 12-13.

### C.    Plaintiffs' Tenancy

Plaintiff Sgt. Bonilla-Santiago is a sergeant in the U.S. Marine Corps who was formerly stationed at Marine Barracks Washington, D.C. SOF ¶ 14. On September 17, 2017, Sgt. Bonilla-Santiago signed a lease (the "Lease") for the Residence, located at 5543-C Kisling Street at JBAB. SOF ¶ 15. Sgt. Bonilla-Santiago and the Landlord are the only parties to the Lease – the three Affiliate Defendants are not parties to the Lease. *Id.*

The same day the Lease was signed, Sgt. Bonilla-Santiago moved into the Residence with his wife (Plaintiff Dayanara Bonilla or "Mrs. Bonilla") and his then-three-year-old child (Plaintiff A.B.). SOF ¶¶ 15-16. On or around November 10, 2017, the adult Bonillas reported that they had seen a rodent in the kitchen of the Residence. SOF ¶ 22. The Property Manager, on behalf of the Landlord, put in a request for the pest control contractor to service the home at the next opportunity. *Id.* Later in November the Bonillas reported seeing mice again and hearing them in the vents. SOF ¶ 23.

In response to the Bonillas' concerns, on December 1, 2017, maintenance technicians visited the Residence to seal holes behind the appliances. SOF ¶ 23. Four days later, on December 5, 2017, external pest control contractors inspected and placed mouse bait in the Residence. SOF ¶ 22. About two weeks later (around December 19, 2017) the pest control contractors returned and placed more bait. *Id.*

The Landlord's pest control efforts were successful. Mrs. Bonilla testified that from Christmas 2017 to at least late October 2018, "there was no evidence that [rodents] were in the house." SOF ¶ 26. Meanwhile, the Landlord had preventative maintenance performed on the Residence, including pest control services, in April 2018 and November 2018. SOF ¶¶ 24-25. Plaintiff K.B., currently four years old, was born during the tenancy, in 2018. SOF ¶ 42.

According to the Plaintiffs' Complaint, "the Bonillas began to notice signs that the rodents had returned" in November 2018, but it was not until at least "[t]he following month" that they reported these issues. SOF ¶ 28. On January 26, 2019, the Landlord had further pest control services performed at the Residence, including treating the interior and exterior for mice, checking for entry points, adding bait stations, and putting the Residence on a follow-up list for treatment every two weeks. SOF ¶ 29. On January 31, 2019, the Landlord arranged for a third-party HVAC contractor to perform duct-cleaning at the Residence. SOF ¶ 30.

Sometime in late December 2018 or January 2019, the Bonillas requested to be moved into another residence. SOF ¶ 28. The Landlord granted this request, the parties executed a new lease for a different house at JBAB, and the Bonillas moved into a new home on February 1, 2019. SOF ¶ 31.

Defendants produced an expert report in which, after canvassing the applicable authorities and regulations, the experts concluded that "BLB Privatized Housing provided the standard of care that is expected within the industry with regards to integrated pest management and met the best practices and strategies of U.S. EPA, the JBAB IPMP, Bolling Family Housing, and the pest management strategies of D.C. Health." SOF ¶ 40. Plaintiffs have not designated any expert on this topic, did not take the deposition of Defendants' expert, and have not provided any evidence whatsoever to refute this expert testimony. *Id.*

### D.    Plaintiffs' Release of Claims

Shortly after moving out of the Residence, the Bonillas demanded financial compensation through their retained lawyers.  The parties negotiated a settlement and on May 14, 2019, Plaintiffs executed a document entitled "Agreement and Release of Claims" (the "Release").  SOF ¶ 32.  In the Release, in exchange for a payment of $10,533 from the Landlord, the Bonillas released "any and all property-related (including both real and personal property …) claims, liabilities [etc.] … whether known or unknown, and whether existing at the present time or arising at any time in the future … including but not limited to, any and all claims, liabilities, demands, causes of action, damages, losses, costs, and expenses arising out of or in any way connected with Residents' tenancy and/or the Residence."  SOF ¶ 33.

The Release contained a single reservation: "This Release does not seek to release claims, if any, solely with respect to personal injury."  *Id*.

### E.    Plaintiffs' Alleged Damages and Mental Distress

In their Initial Disclosures, Plaintiffs initially sought seven categories of damages, including past and future medical expenses of an undisclosed amount.  SOF ¶ 37.  Plaintiffs subsequently amended their initial disclosures to clarify they are only seeking two categories of damages, plus an undisclosed amount of attorneys' fees[1]:

| Category | Amount |
|---|---|
| Basic Allowance for Housing | $40,000 |
| Mental Anguish & Distress | $500,000 per Plaintiff |
| Attorney's Fees | TBD |

---

[1]  There is no fee-shifting provision in the Lease and Defendants are unaware of any other basis for Plaintiffs to claim entitlement to attorneys' fees, whether as an element of damages or as a prevailing party.

SOF ¶ 38.  Plaintiffs have abandoned any claim for damages related to physical injuries and have conceded they incurred no medical expenses or costs related to any health condition claimed in this action.  SOF ¶¶ 38-39.  Each of the Plaintiffs admitted through written discovery that he or she "has not incurred any medical expenses or costs related to conditions claimed in this Action." SOF ¶ 39.

The Basic Allowance for Housing is an amount set by the Air Force and, under the Lease, was the same amount that would be payable to Defendants as monthly rent.  SOF ¶ 38.  In other words, Plaintiffs are seeking a refund on their rent for the time they lived in the Residence.

With respect to the claim for "mental anguish and distress," Plaintiffs have not designated an expert witness on this or any other topic, nor have they produced other competent evidence (such as health records or psychological diagnoses) that might sustain such a claim.  SOF ¶ 40. The amount claimed ($500,000 per Plaintiff, for a total of $2,000,000) was determined by the Plaintiffs' lawyer, according to Mrs. Bonilla's testimony:

> Q:    How did you come up with the figure of $500,000 for mental distress?
>
> A:    I – I didn't.   It was talking through advice with our legal counsel.
>
> …
>
> Q:    So I will ask you the same question on the amount of damages for [Minor Child A.B.] that you are seeking is also $500,000 in mental anguish and distress.  So how did you come up with that number?
>
> A:    Talking with our legal counsel.
>
> Q:    … [T]he two amounts are exactly the same that you are seeking for yourself and you are seeking for your daughter.  So is there some way in which you determined what would be an appropriate dollar value?  …
>
> A:    I really don't know the answer to that.
>
> …

Q:     So you are also seeking $500,000 in mental anguish and distress damages for [Minor Child K.B.]. So what is the basis for seeking $500,000? She was, you know, a newborn when she moved out.

A:     Again, it's – it was through my conversations with legal counsel.

SOF ¶ 41.

The only evidence Plaintiffs have presented on their alleged damages is their own testimony. Sgt. Bonilla-Santiago testified that he experienced stress and fatigue during the time the rodents were a problem, which affected his productivity at work. SOF ¶¶ 55-58. But he never examined, diagnosed, or treated for any medical or mental health conditions at issue here (SOF ¶ 54), and these issues abated after the Landlord successfully eliminated the rodents in December 2017 (SOF ¶ 55).

Mrs. Bonilla testified that she experienced dizziness and migraines while living in the Residence, although she admitted that she had suffered from migraines before living there and has continued to get them since moving out. SOF ¶¶ 59-60. She did not consult a doctor about the dizziness or migraines while living in the Residence. SOF ¶ 62. Aside from this, Mrs. Bonilla's mental distress is limited to concerns for her children's well-being and her tendency to clean more than she used to. SOF ¶ 63.

Minor Child A.B. was three to four years old when she lived in the Residence. SOF ¶ 45. A.B. has never been examined, diagnosed, or treated by a psychologist, psychiatrist, or any other medical professional for any conditions claimed in this action. SOF ¶ 44. A.B. testified that she never saw a rodent, but that she believed there were rodents in the house based on things her mother told her. SOF ¶ 48. She testified that she sometimes has nightmares about various things, including rats, spiders, and getting kidnapped. SOF ¶ 50. In the days after A.B. has a bad dream, she still gets out of bed the next day, eats breakfast, and either goes to school or plays games on

her electronic tablet if it is a weekend.  SOF ¶ 52.  Mrs. Bonilla spoke to doctors about A.B.'s nightmares and anxiety and the doctors told her that A.B.'s nightmares and anxiety were likely caused by her speech problems and frustration with an inability to communicate.  SOF ¶ 53.

Minor child K.B. was a newborn infant at the time the Bonillas moved out of the Residence, and Mrs. Bonilla conceded at deposition that K.B. does not remember anything about the Residence.  SOF ¶ 42 (quoting Mrs. Bonilla's testimony, "[S]he is four years old right now.  She doesn't remember what she ate for breakfast."); *id.* ("She has been checked thoroughly by the doctors all of years.  She is healthy as a fiddle.").

### F.    Procedural History

Plaintiffs brought this action on September 9, 2020, naming as defendants the four current defendants and one other defendant, Hunt MH Shared Services, LLC.  Dkt. No. 1.  Defendants filed a motion to dismiss on November 17, 2020.  Dkt. No. 9.  In response, the Plaintiffs filed an Amended Complaint, which dropped three of their counts but retained the following:

Count 1: Negligence/Premises Liability

Count 2: Negligent Repair

Count 3: Breach of Lease Agreement/Contract

Count 4: Breach of Warranty of Habitability

Count 5: Violation of the District of Columbia Consumer Procedure Protection Act

Count 6: Negligent Misrepresentation

Count 7: Intentional Misrepresentation and Fraud

Count 8: Constructive Eviction

Dkt. No. 23.  Defendants filed another motion to dismiss (Dkt. No. 25), and on March 31, 2022, the Court entered an order granting the motion in part and denying it in part.  Dkt. No. 31.

The Court dismissed Counts 2, 5, 6, 7 and 8 against all Defendants.  With respect to Counts 2, 6, and 7 (for negligent repair, negligent misrepresentation, and fraud), the Court held that these tort claims were duplicative and derivative of the Plaintiffs' breach of contract claim, because they all arose from the same contractual relationship and were inextricably intertwined with Plaintiffs' allegation that the Defendants breached the Lease by failing to provide a house "free of rodents." Dkt. No. 31 at 7-10.  The Court held that the claims were therefore barred under the reasoning of *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008).  Dkt. No. 31 at 7-10. The Court dismissed Count 5, the Consumer Protection and Procedures Act ("CPPA") claim, because the CPPA does not apply to landlord-tenant relationships.  Dkt. No. 31 at 10.  The Court dismissed Count 8, for Constructive Eviction, because the "Plaintiffs asked to be relocated and therefore elected a remedy other than treating the tenancy as a constructive eviction: they did not elect to end their rental relationship with Defendants, move to property not owned by the Defendants and then sue for constructive eviction." *Id.* at 11.

The Court granted the motion in all respects as to Defendant Hunt MH Shared Services, LLC, because the Amended Complaint lacked any allegations linking that separate company to the dispute.  *Id.* at 5-6.  However, the Court sustained the remaining counts as to the other four Defendants, reasoning that the facts alleged in the Complaint suggested a "plausible level of involvement and/or control by the various Defendants" sufficient to overcome a motion to dismiss. *Id.* at 12-13.

The Court's order left in place three counts in the Amended Complaint:  Count 1 for Negligence/Premises Liability; Count 3 for Breach of Lease; and Count 4 for Breach of Implied Warranty of Habitability.  The case has now proceeded through discovery, and is ripe for summary judgment.

## LEGAL STANDARD

The Court should grant summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Potomac Plaza Terraces, Inc. v. QSC Products, Inc.*, 868 F. Supp. 346, 350 (D.D.C. 1994) (citing Fed. R. Civ. P. 56(c)). Thus, "[s]ummary judgment must be granted against a party 'who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Jefferson v. Collins*, 210 F. Supp. 3d 75, 83 (D.D.C. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "A material fact is one that might affect the outcome of the suit under the governing law." *Id.* (quotation marks omitted). "And, a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quotation marks omitted).

## ARGUMENT

I.    **THE RELEASE BARS THE PLAINTIFFS' CLAIMS AS A MATTER OF LAW**

Plaintiffs executed a legally binding Release for claims arising from the tenancy at issue here. SOF ¶¶ 32-36. Under the unambiguous terms of the Release, the Plaintiffs' claims, which arise from the same tenancy under the same Lease, are barred.

"A release is a form of contract, and the rules of contract construction govern its interpretation." *D.C. v. Washington Hosp. Ctr.*, 722 A.2d 332, 342 (D.C. 1998). "Where the terms of the document leave no room for doubt, the effect of the release can be determined as a matter of law." *Id.* (citations omitted); *accord Bolling Federal Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984) ("If the release is facially unambiguous, we must rely solely upon its language as providing the best objective manifestation of the parties' intent.").

The Release at issue here is clear and unambiguous and disposes of this case as a matter of law. It states that the Plaintiffs release every "Releasee" (which includes all Defendants) for "all

property-related (including both *real and personal property* and tangible and intangible assets) claims, liabilities, demands, causes of action, damages, losses, costs, and expenses of any nature or kind."  SOF ¶ 33 (emphasis added).  This includes claims "based on statutory or regulatory authority, common law, contract, tort or other basis, ... arising out of or in any way connected with Residents' tenancy and/or the Residence."  *Id.*  The Release reserves claims "solely with respect to personal injury."  *Id*.  Plaintiffs are not pursuing damages for personal injuries in this lawsuit.

### A.    The Release Bars All Three Remaining Counts

After taking into account the Court's partial grant of Defendants' second motion to dismiss (Dkt. No. 31), Plaintiffs have three remaining causes of action:  Count I for "Negligence/Premises Liability"; Count III for "Breach of Lease"; and Count IV for "Breach of Implied Warranty of Habitability."  Each cause of action is barred by the Release.

### 1.    Negligence/Premises Liability

Plaintiffs' "negligence/premises liability" claim alleges that Defendants had "a statutory duty to maintain the premises free of any condition that may render it unhealthy and unsanitary," including a duty to "exterminate pests such as rodents and insects," and that Defendants "breached that duty."  Dkt. No 23, ¶¶ 56-58 (citing D.C. Mun. Regs. tit. 14, § 805).  No other breach of duty is alleged.

The Release extends to all "property-related claims" based on any "statutory or regulatory authority," including claims pertaining to "real or personal property."  Plaintiffs' negligence claim, as pleaded, is a real property claim – it cites D.C.'s housing regulations as the sole basis of the duty that Defendants allegedly breached, and the claim pertains to the conditions of the Residence, which is real property.  The negligence/premises liability claim has therefore been released and should be dismissed.

12

### 2.    Breach of Lease

The "breach of lease" cause of action is also inherently a real property claim.  A lease vests in the tenant an "estate in possession"[2] and an "estate for years,"[3] both of which are interests in real property.  Any allegation that a lease has been breached is necessarily related to real property.  Here, Plaintiffs allege that that Defendants breached the Lease by "fail[ing] to provide a home free of rodents and fail[ing] to remove rodents from the home."  Dkt. No 23, ¶ 74.  This inherently real property-related claim is encompassed in the Release and therefore barred.

Indeed, if a claim for breach of lease were *not* included in the scope of the Release, it would be difficult to imagine a real property-related claim that *would* fall within the ambit of the Release.  Instead, this provision of the Release would be mere surplusage – an impermissible result under black letter law.  *Steele Foundations, Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 154 (D.C. 2007) (courts must give effect, if possible, to "all of the provisions in the contract").

### 3.    Breach of Warranty of Habitability

Breach of the implied warranty of habitability (Dkt. No. 23 ¶¶ 76-80) is a cause of action that is unique to real property law.  *See generally Freyberg v. DCO 2400 14th St., LLC*, 2021 WL 1317545 at *2 (D.D.C. Apr. 8, 2021) ("In the District, all residential leases include an implied warranty of habitability"); *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1072 (D.C. Cir. 1970) (extent of warranty of habitability is "measured by the standards set out in the Housing Regulations for the District of Columbia").  By its nature, this is a claim related to real property and is barred by the Release.

---

[2] "An estate in possession exists when the owner [of the estate] has an immediate right to the possession of the land."  D.C. Code § 42-507.

[3] "An estate for a determined period of time is an estate for years."  D.C. Code § 42-518.

Given that all three remaining counts relate to real property and given that discovery has revealed that no claims for physical injuries are at issue, all claims are barred by the Release and should be dismissed as a matter of law.

## II.   INDEPENDENT OF THE RELEASE, PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW

### A.   Negligence/Premises Liability

#### 1.   The Negligence Claim Is Duplicative of the Breach of Lease Claim

The Court has already held that for Plaintiffs to pursue a tort claim separate from their breach of contract claim, "the basis of the alleged tortious injury must be 'separable from the terms of the contract.'" Dkt. No. 31, Order on MTD at 8 (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008)). The Court dismissed Plaintiffs' three other tort claims on this basis:

> The basis of Plaintiffs' Complaint is that they contracted for a residence free of rodents. They claim that because they did not receive that benefit – *i.e.*, the Defendants breached the contract – they suffered injuries. The fact that the alleged injuries were physical and psychological is irrelevant because the basis of the alleged tortious injury must be "separable from the terms of the contract" and any "action for breach of contract [must] reach none of the damages suffered by the tort." Plaintiffs' injuries stem from alleged violations of the terms of their lease.

Dkt. No. 31, Order on MTD at 8-9 (quoting *Choharis*, 961 A.2d at 1089).

This holding is the law of the case and is an independent basis for summary judgment dismissing Plaintiffs' negligence/premises liability claim, because that claim relies on the exact same set of facts and obligations as Plaintiffs' breach of contract claim, and the two claims seek the exact same damages. *See Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) ("The law-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided … by that court or a higher one in earlier phases.") (internal quotation marks and alterations omitted).

## 2.    Plaintiffs Cannot Satisfy the Essential Elements of Their Negligence Claim.

Plaintiffs' negligence claim also fails on its own terms.  "[A] claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach."  *Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016).

The Complaint cites D.C.M.R. § 14-805 for the "duty to exterminate pests such as rodents and insects."  The Landlord[4] does not dispute that it was obligated to provide pest control services in accordance with D.C. regulations, the Lease, and even the pest control policies in place at JBAB. The undisputed facts show that the Landlord Defendant *did* discharge its pest control duties by, among other things:

- Complying with the Integrated Pest Management Plan ("IPMP") that governs pest control at JBAB;

- complying with the Facilities Maintenance Plan that outlines pest control standards;

- contracting with a third-party pest control company to provide pest control services at its properties;

- performing quarterly maintenance, which included pest-control checks; and

- deploying maintenance personnel to perform pest control-related maintenance when issues are reported.

SOF ¶¶ 4-11.  It is undisputed that after Plaintiffs reported seeing rodents in their home around November 2017, the Landlord's outside vendor placed bait, the Property Manager's maintenance employees sealed holes behind appliances, and maintenance made a follow-up pest control visit two weeks later.  SOF ¶¶ 22-23.  The Property Manager also performed preventative maintenance at the Residence in April 2018 and November 2018, which included pest control.  SOF ¶¶ 24-25.

---

[4]  The statutory obligations do not apply to the three Affiliate Defendants, who were never parties to the Lease.

Plaintiffs have also testified that between Christmas 2017 and at least late October 2018, they did not have any rodent issues. SOF ¶ 26. According to the Amended Complaint, the Plaintiffs "notice[d] signs that the rodents had returned" in November 2018, but did not report the issue until at least "the following month." SOF ¶ 28. Defendants' own work order log for the Residence indicates that the renewed complaint was not made until January 24, 2019. SOF ¶¶ 29-30. Upon receiving the Plaintiffs' complaint, the Landlord promptly deployed a third-party contractor to perform maintenance and clean out the vents. *Id.* At Plaintiffs' request, the Landlord also relocated Plaintiffs to a new home, which the Plaintiffs moved into on February 1, 2019. SOF ¶ 31.

Defendants' expert has concluded that "BLB Privatized Housing provided the standard of care that is expected within the industry with regards to integrated pest management and met the best practices and strategies U.S. EPA, the JBAB IPMP, Bolling Family Housing, and the pest management strategies of D.C. Health." SOF ¶ 40. This testimony is uncontroverted, and Plaintiffs have not designated any expert or proffered any other evidence that the Landlord or any other Defendant failed to use reasonable care, in breach of a legal duty. *Id.*

Without any evidence contradicting the facts Defendants have established, no reasonable jury could find that the Defendants breached a duty to exterminate pests (or any other duty), and Plaintiffs' negligence claim fails as a matter of law.

### 3.    Plaintiffs' Damages Are Unrecoverable

Plaintiffs seek only two categories of damages: $40,000 for rent, and $500,000 for each plaintiff for purported "mental anguish" damages (totaling $2,000,000). Plaintiffs have abandoned any allegation that they suffered physical injury as a result of their tenancy.

As discussed above, Plaintiffs voluntarily released all real property-related claims in exchange for consideration, excepting only claims for personal injury. This clearly bars the claim for a refund of rent paid under the Release.

The mental anguish damages likewise fail as a matter of law. Historically, under D.C. law "there c[ould] be no recovery for negligently caused emotional distress unless the negligence caused contemporaneous and direct physical injury." *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C. 1990). *Williams* created an exception to this rule where a plaintiff "was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety … regardless of whether plaintiff experienced a physical impact as a direct result of defendant's negligence." *Id.* at 1067. The Court of Appeals later expanded this exception to include cases where the defendant had "an obligation to care for the plaintiff's emotional well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the defendant's undertaking to or relationship with the plaintiff, and serious emotional distress is especially likely to be caused by the defendant's negligence." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 792 (D.C. 2011). Whether this special relationship exists is "determination of law for the court" that can be decided on summary judgment. *Sibley v. St. Albans School*, 134 A.3d 789, 798 (D.C. 2016).

To be actionable, the mental injury "must be serious and verifiable" (*Williams*, 572 A.2d at 1068), and the "emotional distress must be acute, enduring or life-altering" (*Hedgepeth*, 22 A.3d at 817). Mere "disappoint[ment] and hurt" are not enough, even if the plaintiff testifies that she was "emotionally traumatized." *Sibley*, 134 A.3d at 798 & n.3. Instead, the injury must have "resulted in some clearly apparent and substantial physical injury as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental

state." *Cobb v. Washington Metro. Area Transit Auth.*, 2021 WL 2935891, at *5 (D.D.C. July 13, 2021) (brackets omitted); *see also, e.g.*, *Rice v. Dist. of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011) ("'Serious and verifiable' means that the distress must have manifested in an external condition or physical symptoms.").

Applying these rules to the instant case demonstrates that Plaintiffs mental anguish claims fail.

First, there was no "zone of physical danger" – Plaintiffs were never in danger of life or limb due to rodents. "A plaintiff [only] finds herself within the zone of danger if she allegedly is physically endangered by the defendant's negligent activity." *El v. Oparaugo*, 2022 WL 2104484, at *4 (D.D.C. 2022) (internal quotation marks and citation omitted). "A classic example is that of the reckless driver who speeds by a pedestrian, missing her by only inches." *Id.* In *Oparaugo* – another landlord-tenant case – Judge Kollar-Kotelly held that the plaintiff-tenant could not satisfy the zone of danger test, where plaintiff alleged that a chimney collapsed, and that the day *before* the collapse, she and her family had been standing near the area where it collapsed. *Id.* Here, there is no allegation or evidence that Plaintiffs had any physical contact with the rodents, or that they suffered any injuries related to the rodents.

The mere presence of rodents, without any injury and without any evidence of actual physical danger, cannot as a matter of law amount to a "zone of danger" that supports an award of mental anguish damages. If it could, the courts would be flooded with claims by tenants who have become distressed by the appearance of rodents, as occasional, unwanted rodent intrusions are a fact of life for many District residents. SOF ¶ 4 & Ex. 1, IPMP ("House and occasionally deer mice invade buildings and cause damage…"); *see also* SOF ¶ 40 & Ex. 18, Goodfellow Expert Report at p. 22 ("[I]t is impossible to always keep rodents out of residences.").

Nor does a landlord have a special obligation to care for a tenant's emotional well-being. *See Oparaugo*, 2022 WL 2104484, at *4 ("The parties' landlord-tenant relationship does not appear to have implicated Plaintiff's emotional well-being …."). The relationship between landlord and tenant is purely contractual, and neither party undertakes, expressly or impliedly, to protect the other's emotional wellbeing.

Finally, Plaintiffs cannot demonstrate that their mental anguish is "serious and verifiable" and "acute, enduring or life-altering," as required to recover such damages. *Id.* at *3. In fact, Plaintiffs' own testimony demonstrates the opposite:

- None of the four Plaintiffs has been examined, diagnosed, or treated by any medical professional for any condition claimed in this lawsuit. SOF ¶¶ 39, 43-44, 54.

- Plaintiff K.B. was a newborn when she moved out of the home and had no physical or psychological injuries. SOF ¶ 42 (quoting Mrs. Bonilla's testimony: "She has been checked thoroughly by the doctors all of these years. She is healthy as a fiddle.").

- Plaintiff A.B. (now 7 years old) never saw a rodent or rodent droppings and only knows they were there because her mother told her. SOF ¶ 48. Although A.B. occasionally has bad dreams about rodents, she also has bad dreams about spiders and other things and her dreams do not alter her daily life or routine. SOF ¶¶ 50-52.

- Sgt. Bonilla-Santiago asserts that he suffered from anxiety, fear, and an inability to focus when the rodents were present in the home, but also that these issues did not occur during the one-year period when there were no rodent issues at the Residence and the issues subsided once he moved out of the Residence. SOF ¶ 55.

- Plaintiff Dayanara Bonilla testified that she suffered from migraines and dizziness as a result of the rodents but acknowledged that she suffered from migraines prior to moving into the Residence and that the dizziness subsided once she moved out of the Residence.  SOF ¶¶ 59-61.

- Plaintiffs have provided no evidence as to the quantification of their damages. Rather, all that has been disclosed is that the quantum of damages ($500,000 per plaintiff) was determined through advice of counsel.  SOF ¶¶ 40-41.  Plaintiffs' mental anguish damages are therefore not "verifiable."

In the District of Columbia, "an award of damages may not be based on speculation or guesswork." *Trustees of Univ. of D.C. v. Vossoughi,* 963 A.2d 1162, 1175 (D.C. 2009) (internal quotation marks and citation omitted).  While Plaintiffs testified about various forms of emotional distress, they have provided no evidence that would allow a reasonable jury to conclude their symptoms were "serious and verifiable" within the meaning of the cases.  In fact, Plaintiffs' conditions improved or subsided once they moved out.  SOF ¶¶ 55, 60-61.  This is precisely the sort of "trifling distress" that is not legally actionable.  *Williams*, 572 A.2d at 1068 ("[I]n furtherance of the policy of excluding recovery for trifling distress, the claimed distress must be 'serious' and 'verifiable.'").

In sum, even if the Plaintiffs could overcome all the other obstacles to their negligence claim, their damages are unrecoverable as a matter of law, meaning they cannot prove an essential element of their claim and the claim for negligence must be dismissed.

### B. Breach of Lease

Plaintiffs allege that that all four Defendants breached the Lease by "fail[ing] to provide a home free of rodents and fail[ing] to remove rodents from the home."  Dkt. No 23, ¶ 74.  Again,

three of the four Defendants were not parties to the Lease, meaning the claim fails against them. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) ("To prevail on a claim of breach of contract, a party must establish (1) a *valid contract between the parties*; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.") (emphasis added).  Moreover, Plaintiffs can point to no requirement in the Lease to provide a "home free of rodents."  Rather, the Lease required the Landlord to "make a diligent effort to repair or remedy the condition at the Premises" and to "provide pest control services as needed."  SOF ¶ 19.  The uncontroverted evidence is that the Landlord did provide pest control services as needed,[5] made diligent efforts to remedy the condition, and handled the rodent issue in accordance with best industry practices, the requirements of U.S. EPA and D.C. Health, and the pest control policies in place at JBAB.  SOF ¶ 40.  This claim fails on the merits.

Additionally, there are no cognizable damages, meaning another essential element of this claim is lacking.  Plaintiffs' rent claims are barred by the Release, and "claims for 'emotional distress' … are not cognizable under D.C. contract law."  *Armstrong v. Navient Solutions, LLC*, 292 F. Supp. 3d 464, 473 (D.D.C. 2018); *see also Bond v. U.S. Dep't of Justice*, 828 F.Supp. 2d 60, 80 (D.D.C. 2011) ("Damages for emotional harm stemming from any breach [of contract are] not recoverable under District of Columbia law.") (citing *Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1190 (D.C. 1986)).  Plaintiffs are not entitled to a single dollar of emotional distress damages under D.C. law, let alone the $2,000,000 in damages as calculated by their attorney.

---

[5] Both Sgt. Bonilla-Santiago and Mrs. Bonilla testified that pest control services were provided and successfully eliminated the rodents.  SOF ¶ 26.

### C.    Breach of the Warranty of Habitability

"District of Columbia law implies into all residential leases a warranty of habitability, requiring the landlord to maintain the premises in compliance with the District of Columbia Housing Code." *Anderson v. D.C. Hous. Auth.*, 923 A.2d 853, 858 (D.C. 2007).  To prevail on this claim, the Plaintiffs must demonstrate the existence of a lease agreement with a Defendant, and a failure by the Defendant to comply with D.C. housing regulations.  *Freyberg v. DCO 2400 14th St., LLC*, 2021 WL 1317545 at *2 (D.D.C. 2021).  However, "a tenant can recover damages for a landlord's breach of the warranty of habitability only if the landlord did not cure the violation of the housing code at issue within a reasonable amount of time after the landlord received actual or constructive notice of the defective condition." *Parham v. CIH Properties, Inc.*, 208 F. Supp. 3d 116, 125 (D.D.C. 2016).

Although this cause of action "developed as a hybrid of tort and contract claims, the warranty of habitability is implied in leases, and, as is true of most modern warranties, a claim for a breach is essentially a contract cause of action." *Bernstein v. Fernandez,* 649 A.2d 1064, 1074 (D.C. 1991); *accord Javins v. First Nat'l Realty Corp*., 428 F.2d 1071, 1073 (D.C. Cir. 1970) (breach of implied warranty of habitability "gives rise to the usual remedies for breach of contract").  This means that Plaintiffs' claims for mental anguish are not cognizable under a breach of warranty of habitability claim, just as they are not cognizable for a breach of contract claim.

Here, Plaintiffs cannot establish the first required element – the existence of a lease – for three out of the four Defendants.  And as to the Landlord, Plaintiffs cannot demonstrate a breach of the housing regulations, let alone a failure to cure within a reasonable time.  The Amended Complaint contains two citations to the Housing Code.  Dkt. No. 23 at ¶ 77.  The first is D.C. Mun. Regs. Tit. 14 § 805, "Extermination," which states in pertinent part that "[t]he occupant of any single-family dwelling shall keep the premises free from vermin, rodents, and rodent harborage"

(§ 805.1), except in cases where the "infestation of a single habitation is caused by failure of the owner or licensee to maintain a residential building in a rodent-proof or reasonably insect-proof condition, [in which case] the exterminating shall be done by the owner or licensee" (§ 805.3), and further states that "[t]he extermination of vermin and rodents shall be done by the owner or licensee whenever infestation exists in two (2) or more of the habitations in two-family or multiple dwellings" (§ 805.5). The Landlord carried out the extermination at issue here, so even assuming the Landlord had such an obligation under these regulations, the Landlord discharged its duty and there has been no breach of the implied warranty of habitability.

Aside from these Extermination provisions, the only other citation to the Housing Code in this count is a "see also" citation to "D.C.M.R. § 14-600 *et seq*." Dkt. 23 at ¶ 77. This chapter of the Housing Code pertains to "Facilities, Utilities, and Fixtures," and regulates things such as Plumbing Facilities (§ 14-601), Waterproof Floors in Toilets (§ 14-603), and Electrical Outlets (§ 14-605). None of the provisions in this chapter has any apparent relevance to the claims raised by Plaintiffs, and the relevant allegations in this Count speak only to rodent and extermination issues. Dkt. 23 at ¶¶ 76-80. Plaintiffs' citation to this chapter of the Housing Regulations appears to be a throw-away reference unrelated to the matters in this case.

Additionally, and as with the other causes of action, there are no cognizable damages resulting from the alleged breach of the implied warranty of habitability. The claim for housing costs has been released. And because the remedies for breach of implied warranty of habitability are the same as the remedies for breach of contract – and because mental anguish damages are not recoverable in a claim for breach of contract – the Plaintiff's mental distress damages are not recoverable under this count.

In sum, each of the Plaintiffs remaining three claims should be dismissed.

III.   **PLAINTIFFS CANNOT PIERCE THE CORPORATE VEIL TO REACH THE AFFILIATE DEFENDANTS.**

The Plaintiffs have not raised a cognizable claim against any of the three Affiliate Defendants.  The three Affiliate Defendants had no contractual relationship with any of the Plaintiffs, and after full discovery, there is no evidence that would support piercing the corporate veil.  Plaintiffs signed a lease with BLB Privatized Housing, LLC, and all of their claims arise from that landlord-tenant relationship.  Plaintiffs have produced no evidence of collusion, fraud, or any manner of wrongful conduct perpetrated by the Landlord or any of the Affiliate Defendants against any of the Plaintiffs.  Thus, even if some portion of Plaintiffs claims proceed against the Landlord, BLB Privatized Housing, LLC, the Court should dismiss all claims against the Affiliate Defendants.

The normal rule is that "the corporate entity will be respected."  *Jefferson v. Collins*, 210 F. Supp. 3d 75, 95 (D.D.C. 2016) (quotation marks omitted).  A narrow exception exists where the proponent of veil-piercing can demonstrate both "'(1) unity of ownership and interest between the entities, and (2) either the use of the corporate form to perpetuate fraud or wrong, or other considerations of justice and equity [that] justify it.'"  Dkt. 31 at 13 (quoting *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 67 (D.D.C. 2011)); *see also Uni-Top Asia Investment Ltd. v. Sinopec Int'l Petroleum Exploration & Production Corp.*, 2022 WL 252029, at *3 (D.D.C. Jan. 26, 2022) ("[P]iercing the corporate veil … is the rare exception, applied in the case of fraud or certain other exceptional circumstances."  To determine if the first prong is met, this Court examines "the nature of the corporate ownership and control; failure to maintain corporate minutes or records; failure to maintain corporate formalities; comingling of funds and assets; diversion of one corporation's funds to the other's uses; and use of the same office or

business location." *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 90 (D.D.C. 2004).

At the motion to dismiss stage, the Court sustained claims against the Affiliate Defendants based on certain allegations in the Amended Complaint that "suggest[ed] a plausible level of involvement and/or control by the various Defendants."  The Court noted that: (i) the logo on the Lease was labeled "Bolling Family Housing, A Hunt Military Community"; (ii) the word "Hunt" appears on the "Official Hunt Resident Orientation Checklist" and other lease documents; and (iii) the property manager had an "@huntcompanies.com" email address.  Dkt. 31 at 5, 12.

After full discovery, Plaintiffs have not raised any evidence supporting veil-piercing. Sgt. Bonilla Santiago testified that he paid rent to the Landlord and had no reason to believe the Landlord defendant was underfunded or did not have its own bank accounts.  SOF ¶¶ 70-71.  He testified that he did "not know the inner working of any of these companies" (the Defendants), but his "understanding" was that "they're all [] part of each other.  In what way exactly, I can't tell you …."  SOF ¶ 72.  His only basis for believing the Defendants were "part of each other" was the fact that they were listed together as defendants on the Complaint.  *Id.*  Simply put, after full discovery Plaintiffs have no evidence that would support veil-piercing and they cannot meet their burden of proof on this issue.

Instead, Defendants' uncontroverted testimony shows that the Landlord, BLB Privatized Housing, LLC, is a distinct corporate entity.  *See generally* SOF ¶¶ 64-69.  It follows its own corporate formalities, including maintaining its own bank accounts and separate/LLC membership. *Id.*  Assets are not intermingled between the Landlord and the Affiliate Defendants.  *Id.*

Moreover, the Landlord is not undercapitalized and has sufficient funds to satisfy any judgment entered against it in this case (SOF ¶ 69), which weighs strongly against piercing the

corporate veil here. *See C.I. Energia Solar, S.A. v. Ranger Specialized Glass*, 2019 WL 1330852, at *3 (D.D.C. Mar. 25, 2019) (finding no basis to pierce corporate veil where "plaintiff will still be able to recover for all of its claim" even if claims against corporate affiliate are dismissed). While all four entities share the same principal place of business, "it is not at all unusual for a closely held entity to share a common address with its principles." *Kelleher v. Dream Catcher, LLC*, 221 F. Supp. 3d 157, 159 (D.D.C. 2016) (quotation marks omitted). "[M]erely sharing a common address, without more," does not establish alter-ego status. *Id.*

Plaintiffs do not have any evidence to support the allegations in their Complaint related to the Affiliate Defendants beyond what was presented in their motion to dismiss, nor did they even pursue the issue in discovery. Plaintiffs served only four document requests, seeking (1) communications between Plaintiffs and Defendants, (2) logs of those communications, (3) work orders related to pest control and/or infestation at the Residence, and (4) written communications between Military officials related to pest control and/or infestation from 2014-2019. SOF ¶ 73. And Plaintiffs served no interrogatories. *Id*.

A mere similarity of logos, or instances of "Hunt" appearing on documents and in email domains, is insufficient as a matter of law to overcome corporate separateness, as "[c]ourts in this district have specifically held that the joint use of trademarks and a common marketing image" is "not sufficient to establish alter ego status." *C.I. Energia Solar*, 2019 WL 1330852, at *3. Nor does the fact that the Affiliate Defendants are affiliates of the Landlord create the requisite ownership or control to justify piercing the corporate veil. *See Alkanani v. Aegis Defense Servs., LLC*, 976 F. Supp. 2d 1, 9-10 (D.D.C. 2013); *Glycobiosciences, Inc. v. Vichy Laboratories, S.A.*, 2023 WL 157322, at *4 (D.D.C. Jan. 11, 2023) ("The mere corporate relationship … without more, does not suffice.") (quotation marks omitted).

Even if Plaintiffs could demonstrate unity of ownership and interest – which they have not – there is no evidence that the Landlord used its corporate form to perpetrate fraud or wrongdoing, or that justice and equity require setting aside its corporate form to impose liability on its affiliates. *See Alkanani*, 976 F. Supp. 2d at 10 ("[N]owhere … has Plaintiff alleged any facts or shown any evidence that [Defendant's] corporate form was used to perpetrate fraud.  With a record devoid of such facts, … Plaintiff's alter ego theory necessarily fails."); *Jefferson*, 210 F. Supp. 3d at 98 (granting summary judgment where plaintiffs "failed to meet their burden to identify a genuine dispute of material fact regarding the second prong of the veil piercing analysis, i.e., use of the corporate form to perpetuate fraud or wrong or that injustice would result from a failure to pierce [defendants'] corporate veil").

The Court should therefore grant summary judgment dismissing all claims against BLB Property Managers, LLC, Hunt Military Communities Management, LLC, and Hunt Companies, Inc.

## CONCLUSION

The undisputed facts show that the Plaintiffs had a rodent problem for about two months, which the Landlord remediated.  There is no claim of physical injury.  There is no evidence of a serious, verifiable mental injury.  And the Plaintiffs' claims for rent are barred by the Release. There is simply nothing for a jury to decide – the Plaintiffs' distress over encountering rodents, though regrettable, cannot sustain an action in a court of law.

[signature block follows]

Dated: March 30, 2023

Respectfully submitted:

/s/ *Laura B. LoBue*

Laura B. LoBue (DC Bar # 977936)
Jeffrey A. Knight (DC Bar # 460172)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036
Tel: (202) 663-8000
Fax: (202) 663-8007
laura.lobue@pillsburylaw.com
jeffrey.knight@pillsburylaw.com
*Counsel for Defendants*