**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BONILLA-SANTIAGO, et al., | ) CASE NO. 1:20-cv-02524-TSC |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| BLB PRIVATIZED HOUSING, LLC, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL**
**FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Defendants BLB Privatized Housing, LLC, BLB Property Managers, LLC, Hunt Military Communities Management, LLC, and Hunt Companies, Inc., hereby submit this statement of material facts as to which there is no genuine dispute.

**I.    BLB PRIVATIZED HOUSING LLC'S MAINTENANCE OBLIGATIONS AT JBAB**

1.    In 2007, the Department of Defense and BLB Privatized Housing, LLC entered into a long-term ground lease pursuant to the Military Housing Privatization Initiative to develop, own, maintain, and manage the housing at the Hooe Terrace neighborhood and other military family housing at Joint Base Anacostia-Bolling ("JBAB").  *Compare* Plaintiffs' First Amended Compl., Dkt. No. 23 at ¶ 16 (making this allegation) *with* Defendants' Answer to Plaintiffs' First Amended Compl., Dkt. 33, at ¶ 16 (admitting this allegation).

2.     Under the Ground Lease, BLB Privatized Housing, LLC is responsible for owning and managing housing at Bolling, which includes 815 housing units. Declaration of Jamie LaRoche ("LaRoche Decl.") ¶ 6.

3.     The housing units are leased to military servicemembers and their dependents who are stationed at JBAB and other D.C.-area military installations. *Id.*

## II.   <u>MAINTENANCE AND PEST CONTROL REQUIREMENTS</u>

4.     BLB Privatized Housing, LLC follows the standards set forth in the Integrated Pest Management Plan ("IPMP") that governs pest control activities at JBAB. LoBue Decl., Ex. 1, Tran Dep. at 103:18-104:3; LaRoche Decl. ¶ 7 & Ex. 20, IPMP.

5.     In addition, BLB Privatized Housing, LLC's agreement with the Air Force includes a Facilities Maintenance Plan that outlines the pest control standards that BLB Privatized Housing, LLC must follow. LoBue Decl., Ex. 1, Tran Dep. at 103:2-104:21.

6.     Both the IPMP and the Facilities Maintenance Plan have been in place well before January 2017, and BLB Privatized Housing, LLC follows the standards set forth in both documents. LaRoche Decl. ¶ 9; LoBue Decl., Ex. 1, Tran Dep. at 103:2-104:21.

7.     BLB Privatized Housing, LLC also implements broader pest control standards. LaRoche Decl. ¶ 10.

8.     BLB Privatized Housing, LLC contracts with BLB Property Managers, LLC, a property management company, for the performance of certain property management services at JBAB, including engaging third-party pest control services as needed. LaRoche Decl. ¶ 11.

9.     BLB Privatized Housing, LLC contracts with external vendors to perform pest control at JBAB. LaRoche Decl. ¶ 12. Those external vendors must be licensed and insured to perform pest control in D.C. and are required to comply with JBAB's IPMP when performing pest control on the base. LaRoche Decl. ¶ 12; LoBue Decl., Ex. 1, Tran Dep. at 112:14-113:1.

10.     Between January 1, 2017 and December 31, 2020, BLB Privatized Housing, LLC had a service contract with Alexandria Pest Services, Inc. to perform pest control services at JBAB. LaRoche Decl. ¶ 13. In 2017 and 2018, Alexandria Pest Services, Inc. performed services on a weekly basis and in 2019, the pest control services were increased to twice weekly. LaRoche Decl. ¶ 13.

11.     In addition to external vendors, BLB Property Managers, LLC also conducts maintenance, including pest-related maintenance, through its own on-site maintenance team. BLB Property Managers, LLC's maintenance team conducts quarterly visits to residences to perform preventative maintenance and pest control treatment is a part of those visits. LoBue Decl., Ex. 1, Tran Dep. at 46:13-47:11; *id.*, Ex. 3, Quarterly Preventative Maintenance Spreadsheet.

12.     At the time the Bonillas lived at the Residence, there were multiple ways they could report maintenance issues, including pests: (i) call into the housing office, (ii) visit the office in person, or (iii) send an email. LaRoche Decl. ¶ 15. If a concern was reported through any of these methods, it would be entered into BLB Property Managers, LLC's software, called "Yardi," as a work order or work request. *Id.*; LoBue Decl., Ex. 1, Tran Dep. at 20:18-21:11. The maintenance team then evaluated the maintenance priority and sent a maintenance technician and/or a third-party pest control contractor during weekly home visits. LoBue Decl., Ex. 1, Tran Dep. at 21:21-22:5.

13.     The on-site maintenance team also addressed residents' maintenance concerns, including pest-related concerns, including evaluating the priority of the issue, assigning a maintenance technician, and even performing certain pest-related maintenance, including sealing opening to prevent pests from entering residences. LoBue Decl., Ex. 1, Tran Dep. at 111:6-12.

III.    **THE LEASE**

14.    Sgt. Bonilla-Santiago is a sergeant in the U.S. Marine Corps who was formerly stationed at Marine Barracks Washington, D.C. *Compare* Plaintiffs' First Amended Compl., Dkt. No. 23 at ¶ 3 (making this allegation) *with* Defendants' Answer to Plaintiffs' First Amended Compl., Dkt. 33 at ¶ 3 (admitting this allegation).

15.    On September 11, 2017, Sgt. Bonilla-Santiago (as tenant) signed a lease with BLB Housing (as landlord) (the "Lease") for 5543-C Kisling Street (the "Residence"), a house in the Hooe Terrace neighborhood at Bolling.  LoBue Decl., Ex. 4, Lease; LoBue Decl., Ex. 5, Excerpts of Deposition Tr. of Obed Bonilla-Santiago ("Sgt. Bonilla-Santiago Dep.") at 35:19-21.

16.    The Bonilla family moved into the Residence that same day and remained there until February 1, 2019, when they moved to a different home in the same neighborhood also owned and leased by BLB Privatized Housing, LLC. LoBue Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 95:11-15; LaRoche Decl. ¶¶ 14, 23.

17.    The Lease established a 12-month term through September 10, 2018 but provided for automatic renewal on a month-to-month basis after that date. LoBue Decl., Ex. 4, Lease at 1.

18.    The Lease sets the Plaintiffs' monthly rent at $2,124.00, which is equivalent to the Basic Housing Allowance, as set by the Department of Defense. *Id.* at 2.

19.    Section 19 of the Lease is titled "Maintenance and Repairs" and provides that "Resident shall immediately notify landlord of any damage to the Premises. Landlord shall make a diligent effort to repair or remedy the condition at the Premises in accordance with the maintenance procedures provided in the Resident Guidelines." *Id.* at 6.

20.    The Resident Guidelines provide that the Landlord agrees "to maintain all electrical, plumbing, ventilating, air conditioning, appliances and all other facilities and common

4

areas in good and safe working condition," and "to comply with all appliable building and housing code requirements governing residential rental property in the District of Columbia." *Id.* at 6.

## IV. PEST CONTROL SERVICES FOR THE DURATION OF THE LEASE

21.    The Bonillas moved into the Residence on September 11, 2017.  LoBue Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 95:11-15; LaRoche Decl. ¶ 14.

22.    On or around November 10, 2017, BLB Property Managers, LLC put in Work Order 3321204, after the Bonillas complained of seeing a rodent in their kitchen. LaRoche Decl. ¶ 16 & Ex. 3, Work Order 3321204; LoBue Decl., Ex. 7, Excerpts of Deposition Tr. of Dayanara Bonilla ("D. Bonilla Dep.") at 33:18-34:20.  Alexandria Pest Services placed bait inside the home on December 5, 2017, the next available opportunity. LaRoche Decl. ¶ 16 & Ex. 22, Work Order 3321204; LoBue Decl., Ex. 7, D. Bonilla Dep. at 161:3-6. About two weeks after the initial pest control visit, management sent a maintenance technician to make a follow-up pest control visit and place additional poison.  LoBue Decl., Ex. 7, D. Bonilla Dep. at 161:19-162:16.

23.    On or around November 30, 2017, BLB Property Managers, LLC put in Work Order 3333586, after the Bonillas complained of seeing mice and hearing them in the vents. LaRoche Decl. ¶ 17 & Ex. 23, Work Order 3333586; LoBue Decl., Ex. 7, D. Bonilla Dep. at 46:4-10. On December 1, 2017, BLB Property Managers, LLC sent maintenance technicians to seal holes behind appliances at the Residence. LaRoche Decl. ¶ 17 & Ex. 23, Work Order 3333586; LoBue Decl., Ex. 7, D. Bonilla Dep. at 162:17-163:18.

24.    BLB Property Managers, LLC performed preventative maintenance at the Residence on April 10, 2018, which included pest control services.  LaRoche Decl. ¶ 18 & Ex. 24, Work Order 3506385.

25.     BLB Property Managers, LLC again performed preventative maintenance at the Residence on November 15, 2018, which included pest control services. LaRoche Decl. ¶ 19, Ex. 19, Work Order 3812785.

26.     From the period of time between Christmas 2017 and at least October 2018, Plaintiffs did not have any issues with rodents in the Residence.  LoBue Decl., Ex. 7, D. Bonilla Dep. at 51:14-19; *see also* LoBue Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 67:9-14.

27.     Plaintiffs did not submit any work orders related to pest control in the period between November 2017 and January 2019. LaRoche Decl. ¶ 22 & Ex. 28, Work Order Detail Spreadsheet.

28.     According to the Plaintiffs' Complaint, "the Bonillas began to notice signs that the rodents had returned" in November 2018, but it was not until at least "[t]he following month" that they reported these issues." First Amended Compl., Dkt. 23 at ¶¶ 49-50. Sometime in late December 2018 or January 2019, Plaintiffs requested to move to a new home because of rodents. LoBue Decl., Ex. 7, D. Bonilla Dep. at 129:20-130:18.

29.     On January 24, 2019, BLB Property Managers, LLC scheduled Alexandria Pest Services to perform pest control services at the Residence on January 26, which included treating the interior and exterior for mice, checking entry points, adding bait stations, and putting the home on a priority list for treatment every two weeks. LaRoche Decl. ¶ 20, Ex. 26, Work Order 38973725.

30.     Also on January 24, 2019, BLB Property Managers, LLC arranged for the third-party HVAC contractor to perform duct cleaning at the Residence, which was carried out January 31. LaRoche Decl. ¶ 21, Ex. 27, Work Order 3897415.

31.     At Plaintiffs' request, BLB Privatized Housing, LLC relocated them to a new home on February 1, 2019. LaRoche Decl. ¶ 23; LoBue Decl., Ex. 7, D. Bonilla Dep. at 142:22-143:11.

## V.     **THE RELEASE**

32.     On May 14, 2019, Plaintiffs executed an "Agreement and Release of Claims" pertaining to issues they allegedly experienced during their tenancy (the "Release"). Declaration of Sharyn Procaccio ("Procaccio Decl."), Ex. 19, Release.

33.     Paragraph 4 of the Release states that:

> Residents voluntarily release, discharge, and covenant not to sue each and every Releasee from and against any and all property-related (**including both real and personal property** and tangible and intangible assets) claims, liabilities, demands, causes of action, damages, losses, costs, and expenses of any nature or kind, whether known or unknown, and whether existing at the present time or arising at any time in the future, whether based on statutory or regulatory authority, common law, contract, tort or other basis, including but not limited to, any and all claims, liabilities, demands, causes of action, damages, losses, costs, and expenses arising out of or in any way connected with Residents' tenancy and/or the Residence. Without limiting the generality of this release, Residents agree that they will not file or institute any complaint, demand, cause or action, or otherwise initiate any legal or other proceedings against any Releasee or in any way participate in or assist in the prosecution of any complaint, charge, or grievance against any Releasee in any court, agency, or other forum concerning any claims or allegations covered by this Release. This Release does not seek to release claims, if any, solely with respect to personal injury.

*Id.* at 2-3 (emphasis added).

34.     The Release defines "Residents" as "Mr. Obed Emmanuel Bonilla Santiago, Mrs. Dayanara Bonilla, and their respective agents, successors, heirs, and assigns." *Id.* at 1.

35.     The Release defines "Releasees" as "BLB Family Housing LLC, Hunt MH Property Manager LLC, and their respective agents, affiliates, servants, employees, independent contractors, joint ventures, partners, limited partners, investors, insurers, members, officers, directors, shareholders, attorneys, successors, and assigns." *Id.* at 1.

36.     Plaintiffs were paid $10,533 in consideration of their executing the Release.  LoBue

Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 156:14-157:1; Ex. 7, D. Bonilla Dep. at 140:5-9.

VI.     **DAMAGES / INJURIES**

37.     In their initial disclosures, Plaintiffs sought seven categories of damages, but

attributed no amounts to any category:

| Category | Amount |
|---|---|
| Basic Allowance for Housing | TBD |
| Incidental & Temporary Expenses | TBD |
| Temporary Expenses | TBD |
| Moving Expenses | TBD |
| Medical Expenses (Past & Future) | TBD |
| Mental Anguish & Distress | TBD |
| Attorney's Fees | TBD |

LoBue Decl., Ex. 9, Initial Disclosures dated May 25, 2022.

38.     Plaintiffs amended their initial disclosures to clarify that they are seeking only

three categories of damages:

| Category | Amount |
|---|---|
| Basic Allowance for Housing | $40,000 |
| Mental Anguish & Distress | $500,000 per Plaintiff |
| Attorney's Fees | TBD |

LoBue Decl., Ex. 10, Supplemental Initial Disclosures dated August 12, 2022. The Basic

Allowance for Housing is an amount set by the Air Force and was the same amount that would

be payable to BLB Property Managers, LLC as monthly rent. First Amended Compl., Dkt. 23 at

¶ 33.

39.     Plaintiffs have conceded they have not incurred any medical expenses or costs

related to any conditions claimed in this Action. LoBue Decl., Exs. 11, 12, 13, 14, Plaintiffs'

Responses to Requests for Admission.

40.     Defendants submitted an expert report that concluded that "BLB Privatized

Housing provided the standard of care that is expected within the industry with regards to

integrated pest management and met the best practices and strategies of U.S. EPA, the JBAB

IPMP, Bolling Family Housing, and the pest management strategies of D.C. Health." LoBue Decl.,

Ex. 18, Expert Report of William L. Goodfellow, Jr. at 2. Plaintiffs have not disclosed any expert

to testify on any aspect of their damages, any medical expert, or any expert who could verify the

allegation that plaintiffs have suffered mental anguish and distress as a result of being exposed to

rodents for a brief period.  LoBue Decl. ¶ 21. Nor did Plaintiffs take the deposition of Defendants'

experts. LoBue Decl. ¶ 20.

41.     The amount of damages for mental anguish and distress ($500,000 per plaintiff)

was determined through advice of counsel. LoBue Decl., Ex. 7, D. Bonilla Dep. at 116:5-8, 124:19-

125:10, 129:14-19.

A.   **MINOR CHILD K.B.**

42.   K.B. was born in 2018 and was still an infant when the Bonillas moved out of the

residence in January 2019.  K.B. had no physical or psychological injuries from the time she lived

in the Residence:

> Q.   And she has no physical injuries from the time that she lived in the house
> related to the rats or the infestation?
>
> **A.   No, which was one of our major worries when she was born and the
> mice came back. And she was living in the house with them. It was
> one of our biggest worries.**
>
> Q.   One of her biggest worries?
>
> **A.   Our biggest worries.**
>
> Q.   Okay. So what about psychological injuries to [K.B.]?
>
> **A.   She was a newborn. She -- she is four years old right now. She
> doesn't remember what she ate for breakfast.**
>
> **\*\*\***
>
> Q.   Okay. That makes a lot more sense. So what -- I guess, then, since you
> are sitting here, how would you respond to question number five on
> behalf of [K.B.]?
>
> **A.   Other than being born early due to the stress of the preeclampsia,
> she didn't suffer anything else, according to her doctors.**
>
> Q.   Do you believe otherwise? I mean, do you believe that she has some
> physical or psychological –
>
> **A.   No. She has been checked thoroughly by the doctors all of these
> years. She is healthy as a fiddle.**
>
> Q.   Caught up developmentally?
>
> **A.   Oh, yeah. You have no idea.**

LoBue Decl., Ex. 7, D. Bonilla Dep.  at 126:17-127:8, 128:5-19.

43.     K.B. has never been examined, diagnosed, or treated by a psychologist, psychiatrist, or any other medical professional for any conditions claimed in this action.  LoBue Decl., Ex. 14, K.B.'s Response to Defendant's First Set of Requests for Admission.

**B.     MINOR CHILD A.B.**

44.     A.B. has never been examined, diagnosed, or treated by a psychologist, psychiatrist, or any other medical professional for any conditions claimed in this action.  LoBue Decl., Ex. 13, A.B.'s Response to Defendant's First Set of Requests for Admissions.

45.     A.B. was about four years old when she lived in the Residence.  LoBue Decl., Ex. 15, Excerpts of Deposition Tr. of A.B. ("A.B. Dep.") at 28:20-29:2.

46.     According to Mrs. Bonilla, A.B.'s physical and psychological injuries as a result of Defendants' conduct include that she suffered from constant respiratory congestion and that she "began experiencing extreme anxiety and fear on account of the scratching noises the rodents made behind the wall, which in turn led to sleeping problems that persist until today."  LoBue Decl., Ex. 16, A.B.'s Response to Defendant's First Set of Interrogatories.

47.     The Bonillas took A.B. to a doctor for her congestion and the doctor said it was just a cold.  LoBue Decl., Ex. 7, D. Bonilla Dep. at 76:9-20.

48.     Although A.B. testified that the Residence had rats, she also testified that she never saw any rat or any droppings in the house and she just recalls what she was told by her mom:

> Q. So you said a minute ago you remember a house with rats. Can you tell
>    me about that?
>
> **A. It's a big house and it's a place like here. This is a place all got the
>    house and I do have a dream about a rat.**
>
> Q. Let's back up, and can you tell me about that house, what you remember
>    about living there?

**A.  I remember that my mom said – she said that rat poop and pee on my clothes and my toys.**

\*\*\*

Q.  That's okay. When you moved into that house, your sister wasn't born yet, right. So it was just you and your mom and your dad?

**A.  Uh-huh.**

Q.  And then your sister was born while you-all were living in that house, right?

**A.  Yeah. But my mom and my dad never knew there was rats in it. And then when my mom start seeing like the poop and pee everywhere, she -- and then she figure out they got rats in the house.**

Q.  Did you ever see a rat?

**A.  Nope.**

Q.  Do you know what a rat looks like?

**A.  Uh-uh. But when I try, I can't say rat and I only say chi-chis.**

Q.  Chi-chis. Did you ever -- did you ever see any chi-chis?

**A.  No.**

Q.  Did you ever see any chi-chi poop or pee?

**A.  No.**

LoBue Decl., Ex. 15, A.B. Dep. at 28:3-13; 29:15-30:14.

49.     In her deposition, A.B. could not remember if she actually heard noises in the walls coming from rats, but said she had nightmares about it:

Q.  Okay. When you lived in the house in Washington, D.C., do you remember hearing noises in the walls?

**A.  When I lived in that big house?**

Q.  Yeah, in the big house. We'll call it the big house.

A.  **With the rats?**

Q.  Yes, the big house.

A.  **I can't really remember.**

Q.  Do you ever have nightmares about noises in the walls?

A.  **Sometimes.**

Q.  And what do you think those noises are?

A.  **Rats.**

Q.  Why do you think they're rats?

A.  **At our old house we used to have like rats.**

Q.  But you told me that you didn't see any rats, right?

A.  **Yeah.**

Q.  So how do you know then there were rats?

A.  **All the poop and pee.**

Q.  But you didn't see any of the poop and pee, right?

A.  **Oh, yeah.**

Q.  So how do you know that there were rats in the house?

A.  **I think because of the noise.**

Q.  And did somebody tell you that the noise was coming from rats?

A.  **No.**

Q.  Did you just guess that the noise was coming from rats?

A.  **Uh-huh.**

Q.  Do you think that it could have been something else?

A.  **I think.**

*Id.* at 36:18-38:12.

50.     A.B. testified that she sometimes has bad dreams about rats, but she also has bad dreams about getting kidnapped and about spiders. *Id.* at 30:15-31:17. A.B. also has happy dreams about unicorns and ice cream. *Id.* at 32:1-6.

51.     When A.B. has a bad dream, she sometimes sleeps through it and sometimes it wakes her up.  She sometimes goes into her parents' room and sleeps with them or her dad helps her think happy thoughts (like about ice cream or Minecraft) to help her go back to sleep.  *Id.* at 32:7-34:22.

52.     In the days after A.B. has a bad dream, she still gets out of bed the next day, eats breakfast, and either goes to school or plays on her tablet if it was a weekend. *Id.* at 35:1-36:12.

53.     Mrs. Bonilla spoke to doctors about A.B.'s nightmares and anxiety and the doctors told her that A.B.'s nightmares and anxiety were likely because of her speech problems and frustration with an inability to communicate.  LoBue Decl., Ex. 7, D. Bonilla Dep. at 119:9-120:11; *see also id.* at 121:20-122:15.

### C.     OBED BONILLA-SANTIAGO

54.     Sgt. Bonilla-Santiago has never been examined, diagnosed, or treated by a psychologist, psychiatrist, or any other medical professional for any conditions claimed in this action. LoBue Decl., Ex. 11, Obed Bonilla-Santiago's Response to Defendant's First Set of Requests for Admissions.

55.     Sgt. Bonilla-Santiago testified that he suffered from stress and related physical ailments that began when the alleged rodent issue at the Residence began in 2017.  His stress and related physical ailments subsided for the one-year period when the rodent issues at the Residence

subsided, came back when the rodent issue came back in 2018, and subsided once the Bonillas moved out of the Residence.  LoBue Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 110:18-112:17.

56.     From a psychological perspective, Sgt. Bonilla-Santiago testified that he suffers from anxiety, fear, and inability to focus related to the alleged rodent issues at the Residence. LoBue Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 113:2-115:4.

57.     He described the impacts as a "domino effect" that started with not sleeping well, which led to "attending to my family and that in turn takes away from my work performance, my work performance is going to affect my day." *Id.* at 118:21-120:9. He also stated that the alleged rodent issues resulted in him having to deal with the housing office, which caused him to lose time at work. *Id.* These issues did not persist did not persist when he moved out of the Residence.  *Id.* at 120:10-14.

58.     Sgt. Bonilla-Santiago testified that worrying about his family at home with the alleged rodent issues caused him to lack focus and concentration at work, which affected his productivity. *Id.* at 123:1-6. His concentration and productivity issues also subsided when he moved out of the Residence.  After moving out of the Residence, his issues relate to his daughter's sleep problems and his wife's worrying about having to move again.  *Id.* at 127:2-18.

### D.     DAYANARA BONILLA

59.     According to Mrs. Bonilla, her physical and psychological injuries as a result of Defendants' conduct include that she began suffering from migraines and dizziness while living at the Residence. LoBue Decl., Ex. 17, Dayanara Bonilla's Response to Defendants' First Set of Interrogatories.

60.     Mrs. Bonilla suffered from migraines prior to moving into the Residence, but alleges the frequency of the migraines increased when she moved into the Residence.  LoBue

Decl., Ex. 7, D. Bonilla Dep. at 73:11-74:9. She testified that the migraines subsided during the time she lived in the Residence when there was no rodent problem. *Id.* at 74:10-14. Since moving out of the Residence, she only gets migraines once a year. *Id.* at 75:21-76:1.

61.     Mrs. Bonilla alleges she suffered from episodes of dizziness while living in the Residence, but those episodes subsided during the time that there were no rodent issues at the Residence. *Id.* at 74:15-75:15. Since moving out of the Residence, the only episodes of dizziness she has suffered relate to blood sugar levels. *Id.* at 76:5-8.

62.     Mrs. Bonilla did not consult a doctor about the migraines or the dizziness she incurred while living at the Residence. *Id.* at 75:16-20.

63.     Mrs. Bonilla's psychological injuries were limited to concern for the well-being of her children, and the anxiety of "cleaning more than [she] should be cleaning in the house." *Id.* at 84:5-85:11.

## VII.   DEFENDANTS ARE SEPARATE CORPORATE ENTITIES

64.     BLB Privatized Housing, LLC is an indirect subsidiary of Hunt Companies, Inc. and is a distinct corporate entity from BLB Property Managers, LLC, Hunt Military Communities Management, and Hunt Companies, Inc. Procaccio Decl. ¶ 5.

65.     BLB Privatized Housing, LLC maintains its own bank account, separate from the other defendants. *Id.* ¶ 6.

66.     BLB Privatized Housing, LLC maintains separate finances from and does not co-mingle assets with the other Defendants. *Id.* ¶ 7.

67.     BLB Privatized Housing, LLC has a different membership from the other LLC Defendants and from the Board of Directors of Hunt Companies, Inc. *Id.* ¶ 8.

68.    BLB Privatized Housing, LLC obtains funds through payment of rent by its tenants. *Id.* ¶ 9.

69.    BLB Privatized Housing, LLC is not undercapitalized and has sufficient funds to satisfy any judgment entered against it in this case. *Id.* ¶ 10.

70.    Plaintiff Sgt. Obed Bonilla-Santiago confirmed that he pays rent to BLB Privatized Housing, LLC, and does not know why any of the four defendant-companies were established and does not have any reason to believe any of them were created as a fake company. LoBue Decl., Ex. 5, Sgt. Bonilla-Santiago Dep. at 35:19-36:2, 160:17-161:4, 163:11-19, 166:9-17, 173:12-174:2.

71.    Sgt. Bonilla-Santiago also testified that he does not know whether any of the three other defendants have separate bank accounts from or share money with BLB Privatized Housing, LLC.  *Id.* at 162:2-4, 164:1-14, 166:21-167:6, 174:3-6.

72.    Additionally, Sgt. Bonilla-Santiago could not identify any evidence that BLB Privatized Housing, LLC is controlled or directed by the other defendant-entities:

> Q:  How does Hunt Companies, Inc. control the other companies that are listed in paragraphs 29 and 30 [of the complaint]?
>
> A:  Other than the companies working together with each other, I do not know, ma'am.
>
> Q:  And how does Hunt Companies direct the other companies that are listed in paragraphs 29 and 30 [of the complaint]?
>
> A:   I do not know exactly how they direct each other, ma'am.
>
> Q:  Do you have any evidence that Hunt Companies, Inc. does control or direct these other companies, other than that they work together?
>
> A:  I do not have anything or I do not know whether or not they do.

*Id.* at 184-86. He testified that he did "not know the inner working of any of these companies" (the Defendants), but his "understanding" was that "they're all [] part of each other.  In what way exactly, I can't tell you …." *Id.* at 165:16-166:4, 168:17-169:2. His only basis for believing the Defendants were "part of each other" was the fact that they were listed together as defendants on the Complaint.  *Id.* at 169:3-9.

73.     Plaintiffs did not pursue the allegations in their Complaint related to BLB Privatized Housing, LLC's affiliates in discovery. Plaintiffs served only four document requests, seeking (1) communications between Plaintiffs and Defendants, (2) logs of those communications, (3) work orders related to pest control and/or infestation at the Residence, and (4) written communications between Military officials related to pest control and/or infestation from 2014-2019.  LoBue Decl. ¶ 22.  And Plaintiffs served no interrogatories. *Id.*

Dated: March 30, 2023                     Respectfully submitted:


                                          /s/ *Laura B. LoBue*

                                          Laura B. LoBue (DC Bar # 977936)
                                          Jeffrey A. Knight (DC Bar # 460172)
                                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                                          1200 Seventeenth Street, NW
                                          Washington, DC  20036
                                          Tel: (202) 663-8000
                                          Fax: (202) 663-8007
                                          laura.lobue@pillsburylaw.com
                                          jeffrey.knight@pillsburylaw.com
                                          *Counsel for Defendants*